## FERTILIZING COMPANY *v.* HYDE PARK.

An act of the General Assembly of Illinois, approved March 8, 1867, incorporating the Northwestern Fertilizing Company, with continued succession and existence for the term of fifty years, authorized and empowered it to establish and maintain in Cook County, Illinois, at any point south of the dividing line between townships 37 and 38, chemical and other works, "for the purpose of manufacturing and converting dead animals and other animal matter into an agricultural fertilizer, and into other chemical products, by means of chemical, mechanical, and other processes," and to establish and maintain depots in the city of Chicago, in said county, "for the purpose of receiving and carrying off from and out of said city any and all offal, dead animals, and other animal matter which it might buy or own, or which might be delivered to it by the city authorities and other persons." The works, owned by the proprietors thereof before they were incorporated, were located within the designated territory, at a place then swampy and nearly uninhabited, but now forming a part of the village of Hyde Park; and the company established and maintained depots in Chicago. In March, 1869, the legislature passed an act revising the charter of that village, and granting to it the largest powers of police and local government; among them, to "define or abate nuisances which are, or may be, injurious to the public health," provided that the sanitary and police powers thereby conferred should not be exercised against the Northwestern Fertilizing Company in said village until the full expiration of two years from and after the passage of said act. Nov. 29, 1872, the village authorities adopted the following ordinance: "No person shall transfer, carry, haul, or convey any offal, dead animals, or other offensive or unwholesome matter or material, into or through the village of Hyde Park. Any person who shall be in charge of or employed upon any train or team carrying or conveying such matter or material into or through the village of Hyde Park shall be subject to a fine of not less than five nor more than fifty dollars for each offence;" and Jan. 8, 1873, caused the engineer and other employés of a railway company, which was engaged in carrying the offal from the city through the village to the chemical works, to be arrested

and tried for violating the ordinance. They were convicted, and fined fifty dollars each; whereupon the company filed this bill to restrain further prosecutions, and for general relief. *Held*, 1. That nothing passed by the charter of the company but what was granted in express terms or by necessary intendment. 2. That the charter, although, until revoked, a sufficient license, was not a *contract* guaranteeing that the company, notwithstanding its business might become a nuisance by reason of the growth of population around the place originally selected for its works, should for fifty years be exempt from the exercise of the police power of the State. 3. That the charter affords the company no protection from the enforcement of the ordinance.

ERROR to the Supreme Court of the State of Illinois.

The Northwestern Fertilizing Company, a corporation created by an act of the legislature of Illinois, approved March 8, 1867, filed its bill in equity to restrain the village of Hyde Park, in Cook County, Illinois, from enforcing the provisions of an ordinance of that village, which the company claims impairs the obligation of its charter. The bill also prayed for general relief. The Supreme Court of that State affirmed the decree of the Circuit Court of Cook County dismissing the bill; whereupon the company sued out this writ of error.

The charter of the company and the ordinance complained of are, with the facts which gave rise to the suit, set forth in the opinion of the court.

The case was argued by *Mr. Leonard Swett* for the plaintiff in error.

1. The charter confers upon the officers and agents of the company immunity from public prosecution for acts thereby authorized. *Trustees* v. *Utica*, 6 Barb. (N. Y.) 313; *Harris* v. *Thompson*, 9 id. 3; *People* v. *Law*, 34 id. 514; *Stoughton* v. *State*, 5 Wis. 297; *Niederhouse* v. *State*, 28 Ind. 258; 1 Hilliard, Torts, 550. The acts for the commission of which the railway employés were fined were, by the express terms of the charter, authorized. The company engaged them to transport the animal matter from its receiving depots in Chicago to the chemical works, which it had erected at a point confessedly within the limits designated. No other railroad touches at those works, and the company thus used the only means for promptly conveying from the city such matter to its rightful destination.

2. The charter, having been accepted by the company, is a contract with the State which the latter has no power to repeal,

impair, or alter.  *Dartmouth College* v. *Woodward*, 4 Wheat. 518; *Armstadt et al.* v. *Illinois Central Railroad*, 31 Ill. 484; *Buffett et al.* v. *The Great Western Railroad*, id. 355; *State Bank of Ohio* v. *Knoop*, 16 How. 369; *Jefferson Branch Bank* v. *Skelly*, 1 Black, 436; *Bridge Proprietors* v. *Hoboken Company*, 1 Wall. 116; *The Binghamton Bridge*, 3 id. 51; *Home of the Friendless* v. *Rouse*, 8 id. 430; *Washington University* v. *Rouse*, id. 439.

3. Charters which suspend the exercise of the recognized sovereign powers of a State have, as contracts, been repeatedly sustained.  Thus she may, for a consideration, bind herself not to tax a corporation; and a clause to that effect in a charter is a part of the contract, though it curtails, to that extent, her taxing power.  The provision that no State shall pass a law impairing the obligation of contracts imposes a limitation not only upon that power, but upon all her legislation.  *New Jersey* v. *Wilson*, 7 Cranch, 164; *State Bank of Ohio* v. *Knoop*, *supra*; *Home of the Friendless* v. *Rouse, supra*; *Washington University* v. *Rouse, supra*; *Atwater* v. *Woodbridge*, 6 Conn. 223; *Herrick* v. *Randolph*, 13 Vt. 525; *State Bank* v. *People*, 4 Scam. (Ill.) 303; *Illinois Central Railroad Co.* v. *McLean*, 17 Ill. 291; *The Binghamton Bridge, supra*; *Bridge Proprietors* v. *Hoboken Company, supra*; *Conway et al.* v. *Taylor's Ex'rs*, 1 Black, 603; *Costar* v. *Brush*, 25 Wend. (N. Y.) 630; *M'Roberts* v. *Washburn*, 10 Minn. 23; *Murray* v. *Charleston*, 96 U. S. 432.

4. The police power of the State was regarded by the court below as justifying the acts complained of, upon the hypothesis that all her grants are subject to an implied reservation of that power.  There is no room here for such an implication.  It is a contradiction in terms to say that an authority to carry on a particular business within designated limits for a specific period, which has been *expressly* granted by a binding contract, may be taken away at her pleasure, in the exercise of that power.  Police regulations cannot be constitutionally enforced, if they conflict with the charter, or impair any of the essential rights which it confers.  Cooley, Const. Lim. 557; *Washington Bridge Co.* v. *State*, 18 Conn. 53; *Pingrey* v. *Washburn*, 1 Aik. (Vt.) 264; *Miller* v. *New York & Erie Railway Co.*, 21

Barb. (N. Y.) 513; *People* v. *Jackson & Michigan Railroad Co.*, 9 Mich. 307; *People* v. *Platt*, 17 Johns. (N. Y.) 195; *Bailey* v. *Railroad Company*, 4 Harr. (Del.) 389; *Conway* v. *Taylor's Ex'rs, supra; State* v. *Neves*, 47 Me. 189; *State* v. *Jersey City*, 5 Dutch. (N. J.) 170.

A railroad which, without legislative authority, crosses a common highway, is a nuisance. Dillon, Mun. Corp., sect. 561. But when a charter conferring the right to construct such a road over or along a public highway is accepted, the company, if it operates its road with a due regard to the public safety and convenience, cannot be subjected by the State, in the pretended exercise of her police power, to penalties and forfeitures. A nuisance can be legalized; for the State may, for a limited time, surrender her police, as well as any other power. In this case she has done so for a valuable consideration, to secure a result of vital importance.

It was urged below that the charter is not violated by the ordinances, because the company may establish its works at some other point within the territory prescribed. To this there are two obvious answers. 1. The erection of the works is a compliance with the requirements of the charter, and entitles the company to exercise its franchise at the selected site. 2. It is gratuitously assumed that there are other suitable points to which means of rapid transit exist; but suppose there be, it may be safely predicted that, long before the expiration of the charter, the police power, if the decision below be now sustained, will be invoked, so as to render it impracticable for the company to carry on its business at any point, notwithstanding it may have invested capital in making preparation therefor.

5. If the public necessities demand that the franchise of the company shall be appropriated by the State, a proceeding condemning it in the exercise of the right of eminent domain, whereby an adequate compensation will be paid therefor, is the proper and only constitutional remedy. Cooley, Const. Lim. 555, and cases there cited; *Piscataqua Bridge* v. *New Hampshire Bridge*, 7 N. H. 35; *Central Bridge Corporation* v. *Lowell*, 4 Gray (Mass), 474; *West River Bridge* v. *Dix et al.*, 6 How 507; *Annington* v. *Barnett*, 15 Vt. 745; *Boston Water-Power*

*Co.* v. *Boston & Worcester Railroad,* 23 Pick. (Mass.) 360; *Boston & Lowell Railroad Co.* v. *Salem & Lowell Railroad Co.,* 2 Gray (Mass.), 1.

6. The right to equitable relief follows from the preceding. propositions. *Boston & Lowell Railroad Co.* v. *Salem & Lowell Railroad Co., supra; Craton Turnpike* v. *Kider,* 1 Johns. (N.Y.) Ch. 611; *Livingston* v. *Van Dusen,* 9 Johns. (N. Y.) 507; High, Injunctions, sect. 318, and cases cited.

*Mr. Charles Hitchcock, contra.*

MR. JUSTICE SWAYNE delivered the opinion of the court.

This case was brought here by a writ of error to the Supreme Court of the State of Illinois.

The alleged ground of our jurisdiction is, that the record presents a question of Federal jurisprudence. A brief statement of the facts will be sufficient for the purposes of this opinion.

The plaintiff in error was incorporated by an act of the legislature, approved March 8, 1867. The act declared that the corporation should " have continued succession and existence for the term of fifty years." The fourth and fifth sections are as follows: —

" SECT. 4. Said corporation is hereby authorized and empowered to establish and maintain chemical and other works at the place designated herein, for the purpose of manufacturing and converting dead animals and other animal matter into an agricultural fertilizer, and into other chemical products, by means of chemical, mechanical, and other processes.

" SECT. 5. Said chemical works shall be established in Cook County, Illinois, at any point south of the dividing line between townships 37 and 38. Said corporation may establish and maintain depots in the city of Chicago, in said county, for the purpose of receiving and carrying off, from and out of the said city, any and all offal, dead animals, and other animal matter, which they may buy or own, or which may be delivered to them by the city authorities and other persons."

The company organized pursuant to the charter. Its capital stock is $250,000, all of which has been paid up and invested in its business.

It owns ground and has its receiving depot about three miles from Chicago. The cost of both exceeded $15,000. Thither the offal arising from the slaughtering in the city was conveyed daily. The chemical works of the company are in Cook County, south of the dividing line of townships 37 and 38, as required by the charter. When put there, the country around was swampy and nearly uninhabited, giving little promise of further improvement. They are within the present limits of the village of Hyde Park. The offal procured by the company was transported from Chicago to its works through the village by the Pittsburg, Fort Wayne, and Chicago Railroad. There was no other railroad by which it could be done. The court below, in its opinion, said: —

"An examination of the evidence in this case clearly shows that this factory was an unendurable nuisance to the inhabitants for many miles around its location; that the stench was intolerable, producing nausea, discomfort, if not sickness, to the people; that it depreciated the value of property, and was a source of immense annoyance. It is, perhaps, as great a nuisance as could be found or even created; not affecting as many persons as if located in or nearer to the city, but as intense in its noisome effects as could be produced. And the transportation of this putrid animal matter through the streets of the village, as we infer from the evidence, was offensive in a high degree both to sight and smell."

This characterization is fully sustained by the testimony.

In March, 1869, the charter of the village was revised by the legislature, and the largest powers of police and local government were conferred. The trustees were expressly authorized to "define or abate nuisances which are, or may be, injurious to the public health,"—to compel the owner of any grocery-cellar, tallow-chandler shop, soap factory, tannery, or other unwholesome place, to cleanse or abate such place, as might be necessary, and to regulate, prohibit, or license breweries, tanneries, packing-houses, butcher-shops, stock-yards, or establishments for steaming and rendering lard, tallow-offal, or other substances, and all establishments and places where any nauseous, offensive, or unwholesome business was carried on. The sixteenth section contains a proviso that the powers given

should not be exercised against the Northwestern Fertilizing Company until after two years from the passage of the act. This limitation was evidently a compromise by conflicting parties.

On the 5th of March, 1867, a prior act, giving substantially the same powers to the village, was approved and became a law. This act provided that nothing contained in it should be construed to authorize the officers of the village to interfere with parties engaged in transporting any animal matter from Chicago, or from manufacturing it into a fertilizer or other chemical product. The works here in question were in existence and in operation where they now are before the proprietors were incorporated.

After the last revision of the charter the municipality passed an ordinance whereby, among other things, it was declared that no person should transport any offal or other offensive or unwholesome matter through the village, and that any person employed upon any train or team conveying such matter should be liable to a fine of not less than five nor more than fifty dollars for each offence; and that no person should maintain or carry on any offensive or unwholesome business or establishment within the limits of the village, nor within one mile of those limits. Any person violating either of these provisions was subjected to a penalty of not less than fifty nor more than two hundred dollars for each offence, and to a like fine for each day the establishment or business should be continued after the first conviction.

After the adoption of this ordinance and the expiration of two years from the passage of the act of 1869, notice was given to the company, that, if it continued to transport offal through the village as before, the ordinance would be enforced. This having no effect, thereafter, on the 8th of January, 1873, the village authorities caused the engineer and other employés of the railway company, who were engaged in carrying the offal through the village, to be arrested and tried for violating the ordinance. They were convicted, and fined each fifty dollars. This bill was thereupon filed by the company. It prays that further prosecutions may be enjoined, and for general relief. The Supreme Court of the State, upon

appeal, dismissed the bill, and the company sued out this writ of error.

The plaintiff in error claims that it is protected by its charter from the enforcement against it of the ordinances complained of, and that its charter is a contract within the meaning of the contract clause of the Constitution of the United States. Whether this is so, is the question to be considered.

The rule of construction in this class of cases is that it shall be most strongly against the corporation. Every reasonable doubt is to be resolved adversely. Nothing is to be taken as conceded but what is given in unmistakable terms, or by an implication equally clear. The affirmative must be shown. Silence is negation, and doubt is fatal to the claim. This doctrine is vital to the public welfare. It is axiomatic in the jurisprudence of this court. It may be well to cite a few cases by way of illustration. In *Rector, &c. of Christ Church* v. *The County of Philadelphia* (24 How. 301), in *Tucker* v. *Ferguson* (22 Wall. 527), and in *West Wisconsin Railroad Co.* v. *Board of Supervisors* (93 U. S. 595), property had been expressly exempted for a time from taxation. Taxes were imposed contrary to the terms of the exemption in each case. The corporations objected. This court held that the promised forbearance was only a bounty or gratuity, and that there was no contract. In *The Providence Bank* v. *Billings & Pittman* (4 Pet. 515), the bank had been incorporated with the powers usually given to such institutions. The charter was silent as to taxation. The legislature imposed taxes. "The power to tax involves the power to destroy." *McCulloch* v. *Maryland*, 4 Wheat. 316. The bank resisted, and brought the case here for final determination. This court held that there was no immunity, and that the bank was liable for the taxes as an individual would have been. There is the same silence in the charter here in question as to taxation and as to liability for nuisances. Can exemption be claimed as to one more than the other? Is not the case just cited conclusive as to both?

Continued succession is given to corporations to prevent embarrassment arising from the death of their members. One striking difference between the artificial and a natural person

is, that the latter can do any thing not forbidden by law, while the former can do only what is so permitted. Its powers and immunities depend primarily upon the law of its creation. Beyond that it is subject, like individuals, to the will of the law-making power.

If the intent of the legislature touching the point under consideration be sought in the charter and its history, it will be found to be in accordance with the view we have expressed as matter of law. Three days before the charter of the plaintiff in error became a law, the legislature declared that the power of the village as to nuisances should not extend to those engaged in the business to which the charter relates. The subject must have been fully present to the legislative mind when the company's charter was passed. If it were intended the exemption should be inviolable, why was it not put in the company's charter as well as in that of the village? The silence of the former, under the circumstances, is a pregnant fact. In one case it was doubtless known to all concerned that the restriction would be irrepealable, while in the other, that it could be revoked at any time. In the revised village charter of 1869, the exemption was limited to two years from the passage of the act. This was equivalent to a declaration that after the lapse of the two years the full power of the village might be applied to the extent found necessary. Corporations in such cases are usually prolific of promises, and the legislature was willing to await the event for the time named.

That a nuisance of a flagrant character existed, as found by the court below, is not controverted. We cannot doubt that the police power of the State was applicable and adequate to give an effectual remedy. That power belonged to the States when the Federal Constitution was adopted. They did not surrender it, and they all have it now. It extends to the entire property and business within their local jurisdiction. Both are subject to it in all proper cases. It rests upon the fundamental principle that every one shall so use his own as not to wrong and injure another. To regulate and abate nuisances is one of its ordinary functions. The adjudged cases showing its exercise where corporate franchises were involved are numerous.

In *Coates* v. *The Mayor and Aldermen of the City of New York* (7 Cow. (N. Y.) 585), a law was enacted by the legislature of the State on the 9th of March, 1813, which gave to the city government power to pass ordinances regulating, and, if necessary, preventing the interment of dead bodies within the city; and a penalty of $250 was authorized to be imposed for the violation of the prohibition. On the 7th of October, 1823, an ordinance was adopted, forbidding interments or the depositing of dead bodies in vaults in the city south of a designated line. A penalty was prescribed for its violation. The action was brought to recover the penalty for depositing a dead body in a vault in Trinity churchyard. A plea was interposed, setting forth that the *locus in quo* was granted by the King of Great Britain, on the 6th of May, 1697, to a corporation by the name of the " Rector and Inhabitants of the City of New York in Communion with the Protestant Episcopal Church of England," and their successors for ever, as and for a churchyard and burying place, with the rights, fees, &c.; that immediately after the grant the land was appropriated, and thenceforward was used as and for a cemetery for the interment of dead bodies; that the rector and wardens of Trinity Church were the same corporation; and that the body in question was deposited in the vault in the churchyard by the license of that corporation. A general demurrer was filed, and the case elaborately argued.

The validity of the ordinance was sustained. The court held that "the act under which it was passed was not unconstitutional, either as impairing the obligation of contracts, or taking property for public use without compensation, but stands on the police power to make regulations in respect to nuisances." It was said : " Every right, from absolute ownership in property down to a mere easement, is purchased and holden subject to the restriction that it shall be so exercised as not to injure others. Though at the time it be remote and inoffensive, the purchaser is bound to know at his peril that it may become otherwise by the residence of many people in its vicinity, and that it must yield to by-laws and other regular remedies for the suppression of nuisances."

In such cases, prescription, whatever the length of time, has

no application.    Every day's continuance is a new offence, and it is no justification that the party complaining came voluntarily within its reach.    Pure air and the comfortable enjoyment of property are as much rights belonging to it as the right of possession and occupancy.    If population, where there was none before, approaches a nuisance, it is the duty of those liable at once to put an end to it.    *Brady* v. *Weeks*, 3 Barb. (N. Y.) 157.

The legislature of Massachusetts, on the 1st of February, 1827, incorporated the " Boston Beer Company," " for the purpose of manufacturing malt liquors in all their varieties in the city of Boston," &c.    By an act of June, 1869, the manufacture of malt liquors to be sold in Massachusetts, and brewing and keeping them for sale, were prohibited, under penalties of fine and imprisonment and the forfeiture of the liquors to the Commonwealth.    In *Beer Company* v. *The Commonwealth*, the Supreme Court of Massachusetts held that " the act of 1869 does not impair the obligations of the contract contained in the charter of the claimant, so far as it relates to the sale of malt liquors, but is binding on the claimant to the same extent as on individuals.

" The act is in the nature of a police regulation in regard to the sale of a certain article of property, and is applicable to the sale of such property by individuals and corporations, even where the charter of the corporation cannot be altered or repealed by the legislature."

This court unanimously affirmed that judgment.    In our opinion, Mr. Justice Bradley, speaking for the court, said: " Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health, and property of the citizens, and to the preservation of good order and the public morals."    The judgment here was placed also upon another ground.    *Beer Company* v. *Massachusetts*, *supra*, p. 25.

Perhaps the most striking application of the police power is in the destruction of buildings to prevent the spread of a conflagration.    This right existed by the common law, and the

owner was entitled to no compensation. 2 Kent, Com. 389, and notes 1 and *a* and *b*. In some of the States it is regulated by statute. *Russel* v. *The Mayor of New York*, 2 Den. (N. Y.) 461; *American Print Works* v. *Lawrence*, 23 N. J. L. 590.

In the case before us it does not appear that the factory could not be removed to some other place south of the designated line, where it could be operated, and where offal could be. conveyed to it from the city by some other railroad, both without rightful objection. The company had the choice of any point within the designated limits. In that respect there is no restriction.

The charter was a sufficient license until revoked; but we cannot regard it as a contract guaranteeing, in the locality originally selected, exemption for fifty years from the exercise of the police power of the State, however serious the nuisance might become in the future, by reason of the growth of population around it. The owners had no such exemption before they were incorporated, and we think the charter did not give it to them.

There is a class of nuisances designated "legalized." These are cases which rest for their sanction upon the intent of the law under which they are created, the paramount power of the legislature, the principle of "the greatest good of the greatest number," and the importance of the public benefit and convenience involved in their continuance. The topic is fully discussed in Wood on Nuisances, c. 23, p. 781. See also 4 Waite, Actions and Defences, 728. This case is not within that category. We need not, therefore, consider the subject in this opinion.

*Decree affirmed.*

MR. JUSTICE FIELD did not sit in this case, nor take any part in its decision.

MR. JUSTICE MILLER concurred in the judgment; MR. JUSTICE STRONG dissented.

MR. JUSTICE MILLER. I concur in the judgment of the court, but cannot agree to the principal argument by which it

is supported in the opinion. As the question turns upon the existence of a contract and its nature, and not upon the power of the legislature to pass laws affecting the health and comfort of the community, a reference to them and to the power to repeal and modify them, where no contract is in question, is irrelevant. It is said that such contract as may be found in the present case was made subject to the police power of the legislature over the class of subjects to which it relates. The extent to which this is true depends upon the specific character of the contract and not upon the general doctrine. This court has repeatedly decided that a State may by contract bargain away her right of taxation. I have not concurred in that view, but it is the settled law of this court. If a State may make a contract on that subject which it cannot abrogate or repeal, it may, with far more reason, make a contract for a limited time for the removal of a continuing nuisance from a populous city.

The nuisance in the case before us was the very subject-matter of the contract. The consideration of the contract was that the company might and should do certain things which affected the health and comfort of the community; and the State can no more impair the obligation of that contract than it can resume the right of taxation which it has on valid consideration agreed not to exercise, because in either case the wisdom of its legislation has become doubtful.

If the good of the entire community requires the destruction of the company's rights under this contract, let the entire community pay therefor, by condemning the same for public use.

But I agree that contracts like this must be clearly established, and the powers of the legislature can only be limited by the express terms of the contract, or by what is necessarily implied. In the case before us, the company has two correlative rights in regard to the offal at the slaughter-houses in Chicago. One is to have within the limit of that city depots for receiving it, and the other is to carry it to a place in Cook County south of the dividing line between townships 37 and 38. The city or the State legislature is not forbidden by the contract to locate such depots within the city, where the health of

the city requires; in other words, the company has not the choice of location within the city. So, in regard to the chemical works. The company, by its contract, is entitled to have them in Cook County south of the line mentioned; but the precise locality within that large space is a fair subject of regulation by the police power of the State, or of any town to which it has been delegated. If within the limits of Hyde Park, that town may pass such laws concerning its health and comfort as may require the company to seek another location south of the designated line, without impairing the terms of the contract.

It is said that the only railroad by which the company can carry offal passes through Hyde Park, and that the ordinance is fatal to the use of the road. But the State did not contract that the company might carry by railroad, still less by that road. In short, in my opinion, there is within the limits of the original designation of boundary ample space where the company may exercise the power granted by the contract, without violating the ordinances of Hyde Park, and they, as a police regulation of health and comfort, are therefore valid, as not infringing that contract.

For this reason alone, I think the decree should be affirmed.

MR. JUSTICE STRONG. I cannot concur in the judgment directed by the court in this case. That the charter granted by the legislature, March 8, 1867, and accepted by the company, is a contract protected by the Constitution of the United States, cannot be denied, in the face of *Dartmouth College* v. *Woodward* (4 Wheat. 518), and the long line of decisions that have followed in its wake and reasserted its doctrines. And if the company holds its rights under and by force of the contract, those rights cannot be taken away or impaired, either directly or indirectly, by any subsequent legislation. This I believe to be incontrovertible, though the opinion just delivered may seem to express a doubt of it.

What, then, was the contract created by the charter and its acceptance? The first, second, and third sections constituted certain persons named, and their successors, associates, and assigns, a body politic and corporate, to have continued suc-

cession and existence for the term of fifty. years, and declared that its capital stock should be $50,000, but gave the company power to increase the same to any sum not exceeding $250,000.

The fourth and fifth sections are as follows: —

"SECT. 4. Said corporation is hereby authorized and empowered to establish and maintain chemical and other works at the place designated herein, for the purpose of manufacturing and converting dead animals and other animal matter into an agricultural fertilizer and into other chemical products, by means of chemical, mechanical, and other processes.

"SECT. 5. Said chemical works shall be established in Cook County, Illinois, at any point south of the dividing line between townships 37 and 38. Said corporation may establish and maintain depots in the city of Chicago, in said county, for the purpose of receiving and carrying off from and out of the said city any and all offal, dead animals, and other animal matter which they may buy or own, or which may be delivered to them by the city authorities and other persons."

In order to have a clear apprehension of the rights and privileges which this charter was intended to secure to the company, and of the purposes which the legislature that granted it had in view, it is both admissible and important to take notice of the circumstances that existed at the time of its grant, so far as they are shown by the record. Chicago was then a populous city, built upon a level plain, where drainage and sewerage are exceedingly difficult, if not impossible. The slaughtering of animals and packing the flesh for markets in other places were conducted there upon a stupendous scale. The business had been growing in magnitude for years, and bid fair to be what it has become, — larger than that of any city in the United States, if not in the world. Of necessity, the amount of blood and offal produced was correspondingly large. It could not be disposed of or allowed to accumulate there without manifestly endangering the health and injuriously affecting the comfort of the hundreds of thousands of inhabitants of the city. It was, therefore, a matter of public importance to provide for its removal elsewhere. Such would have been the case had the business of slaughtering extended

no further than to supply the domestic market. At that time there was in the county of Cook, about thirteen miles south of the city, a marshy region in the midst of swamps, and much of it at all seasons covered with shallow ponds and bayous. It was very thinly inhabited, and it held out few, if any, invitations for additional settlement. Obviously it was a thing of public interest to relieve the city from accumulations of the blood and offal, and have them transported to a place where they would cause no injury, or so much less than they would cause if remaining in the midst of a dense population. It cannot be supposed that the legislature was unmindful of these considerations. The charter itself furnishes evidence that its motive and purpose were to furnish relief to the city, doing the least possible harm to residents in other localities. It offered to the grantees certain privileges as the consideration for large expenditures by them for removing from the city the matter so injurious to its inhabitants. It expressly authorized the establishment and maintenance by the corporation of chemical and other works for the purpose of manufacturing and converting dead animals and other animal matter into an agricultural fertilizer and into other chemical products. It designated the place where the works might be located as "in Cook County, at any point south of the dividing line between townships 37 and 38." It also granted to the corporation the right to establish and maintain depots in the city "for the purpose of receiving and carrying off from and out of the city any and all offal, dead animals, and other animal matter which they (the company) may buy or own, or which may be delivered to them by the city authorities or other persons."

When accepted, it was, therefore, a contract by which the State authorized the company to establish works and carry on a business which, without the authority, would be a nuisance to a few persons, in order to relieve a very large community from a greater nuisance. It was, therefore, a grant of a right to maintain a local nuisance.

In the exercise of the rights thus granted, the company established their works at a place in Cook County, south of the dividing line between townships 37 and 38, in what

is now the village of Hyde Park, but quite remote from the thickly inhabited part of the village. The point at which they are located is within the limits designated by the legislature. The selection of the place within those limits was confided by the charter to the company, and when the selection was made and the works were erected, the charter conferred the right to maintain them and carry on the business where they were located. I concede that the company could not exercise their discretion wantonly or in negligent disregard of the rights of others. But there is nothing in the case tending to show such disregard or wantonness. There is nothing to show, and it is not claimed, that the works are not at a place where they were authorized to be erected. On the contrary, there is every thing to show that the neighborhood where they were located was swampy and nearly uninhabited, giving, as I have said, little promise of further improvement.

The company also, at large expense, erected receiving depots, as authorized by the charter, for the purpose of receiving and carrying from the city matter consisting of dead animals and offal, and engaged in having it transported upon the only railroad upon which it could be transported to the chemical works located within the limits of the municipal division known as Hyde Park Village. That by the charter they were authorized to transport it thither, I regard as beyond any reasonable doubt. I admit to the fullest extent the rule that all charters of private corporations are to be construed most strongly against the corporations. Nothing is granted that is not expressly or clearly implied. But this rule is quite consistent with another, equally settled, that charters are to receive a reasonable interpretation in view of the purposes for which they were made. An express grant of power must include whatever is indispensably necessary to its enjoyment. No man can reasonably deny that a grant of power to establish works at a certain place to convert animal matter into an agricultural fertilizer, coupled with power to establish depots for receiving and carrying it from the city, does authorize its transportation to the converting works. It is not denied in the present case. One of the rights, then, which the company obtained by their charter was to carry the offal, dead animals, and other animal matter

into and through the village of Hyde Park to the works authorized for its conversion.

To recapitulate: The company obtained by their contract with the State, among others, three rights: One, a right to establish and maintain at a place in Cook County, south of the dividing line between townships 37 and 38, works for converting animal matter. The works have been established there at a cost of more than $200,000; second, they obtained the right to establish receiving depots for receiving and carrying such matter from Chicago; and, third, they obtained the right to carry such matter from their receiving depots to their converting works in Hyde Park. I do not understand any of these propositions to be questioned, either by the defendants in error or by the majority of this court.

The only serious question, therefore, is whether by any law of the State this contract has been impaired, and the rights assured by it have been taken away. On the 26th of March, 1869, nearly two years after the charter had been granted and accepted, the legislature of the State passed an act, entitled "An Act to revise the charter of the town of Hyde Park, in Cook County," giving therein full sanitary and police powers to the municipal authorities, but containing the following proviso: "The sanitary powers conferred by this act shall not be exercised by said board of trustees as against the Northwestern Fertilizing Company or the Union Rendering Company, located at or near the Calumet River, in said town, until the full expiration of two years after the passage of this act." Under this act the board of trustees, on the 14th of February, 1870, adopted an ordinance declaring all establishments for rendering offal, &c., nuisances, and imposing penalties upon any person who shall own, keep, or use them. The ordinance also prohibited the deposit of any dead animals or other filthy, nauseous, or offensive substance on any lot, street, alley, or other place in the town, and imposed penalties for any violation of the ordinance. On the 10th of April, 1872, the village of Hyde Park was incorporated, and succeeded to the rights and duties of the town of the same name; and on the twenty-ninth day of November, of that year, another ordinance of the village was made, reiterating in substance the provisions of the ordinance of Feb.

14, 1870. It went further, and its provisions make it impossible for the company to enjoy the rights accorded to them by their charter. It declared to be nuisances all places within the village kept, occupied, or used for the purpose of rendering offal. or animal substances, when the same is or may be kept in such a manner as to occasion any offensive smell, and all places where any nauseous, unwholesome, or offensive business may be carried on, and it imposes penalties upon offenders. It prohibited the establishment, maintenance, or carrying on of any offensive or unwholesome business or establishment within the limits of the village, or within one mile of the limits thereof, and it ordained that "no person shall transfer, carry, haul, or convey any offal, dead animals, or other offensive matter or material into or through the village of Hyde Park." All these provisions are sanctioned by prescribed penalties, and the village authorities are enforcing them against the company. If they are enforced, it cannot carry on the business which its charter authorized. The offal from Chicago or elsewhere cannot be brought to the works; and if it could, the company could not render it into a fertilizer. The ordinance is in direct conflict with the legislative grant, a grant which was for a consideration returned, and which, therefore, has the force of a contract. It is, in my judgment, a palpable violation of the constitutional provision that no State shall pass a law impairing the obligation of a contract.

It has been suggested that the charter did not precisely designate the place where the rendering works might be established, and to which the city offal might be carried; and hence it is argued that, notwithstanding the contract, it is within the power of the legislature to order the removal of the works to another locality, and that this may be done mediately by a municipal corporation empowered by the State. The inference I emphatically deny. It is true the charter empowered the company to select a location within certain geographical limits, and did not itself define the exact point; but when under this power a location was made by the company, and hundreds of thousands of dollars were expended upon it, it was beyond the power of the other contracting party to change it. The location was lawful when made, and, if lawful then, it can-

not be made unlawful afterwards. If it could be, it would be in the power of the legislature to change it a second, a third, a fiftieth time, and fix it at last at a place where none of the rights of the company could be enjoyed. No one has ever doubted that when a railroad company has been authorized, as is often the case, to construct a railroad beginning at some point within a township or a county, and has constructed its road from some point in that township or county, its right to maintain it from that terminus is indefeasible. That which was left uncertain has become certain. So, if a warrant be granted for a tract of land in a specified district without describing it, when the warrantee has selected a tract, the contract is closed, and his right to that tract is absolute. It must be, therefore, that the location of the company's works at the places where they were located, recognized as a proper location in the act of the legislature of 1869, is one which cannot be changed without the consent of both parties to the contract, or without compensation made.

But it is said the ordinance complained of is only an exercise of the police power of the State, and that the charter must be assumed to have been granted and accepted subject to that police power. I admit that the police power of a State extends generally to the prevention and removal of things injurious to the comfort of the public. I admit also that the works of the company may have been and probably were offensive, and were a nuisance, unless their character was changed by the law. So, also, carrying offal, or animal matter, into or through the village may have been and probably was more or less offensive. But the question now is, were the works or the transportation things illegal? In view of the contract contained in the charter, was it a legitimate exercise of the State's police power to declare them illegal, abate them, and inflict penalties for doing what the State had declared that the company might do? I am confident it was not. Had the charter been a mere license, instead of a contract, the case would be different. But the legislature may legalize acts which, without such legislation, would be obnoxious to criminal law. It may legalize that which, without such action, would be a nuisance. It may do this either by law or by contract. It may limit the extent to

which its police power shall be exerted. And it often does. The charter of a railroad company is a familiar illustration. Crossing highways and running locomotives, were they not authorized by law, would be nuisances. Who will contend that, when a charter has been granted for building a railway and running locomotives thereon, the company or its agents can be punished criminally for maintaining a nuisance? Why not? Because there is no nuisance in the eye of the law, and the State has contracted away a portion of its police power. So, also, an illustration may be found in the case of gas companies. If a legislature charter a gas company, and locate its works at a designated place, authorizing the manufacture of gas there, it would be marvellous indeed if the agents of the company could be indicted for a nuisance, or if the legislature could without compensation deny the exercise of the powers granted, because manufacturing gas is offensive. The police power of a State is no more sacred than its taxing power. We have held again and again that a State may by contract with one of its corporations bind itself not to tax the property of that corporation. If so, why may it not bind itself not to exercise its police power over certain employments. It would be a monstrous stretch of credulity to conclude that the legislature of Illinois did not intend such a relinquishment of police power when it granted the charter to the plaintiff in error. Its members must be assumed to have had common knowledge. They knew the offensiveness of animal offal. The plain object of the charter was to relieve the citizens of Chicago from it. The legislature knew that the transportation of the offal to a point south of the designated line, and its deposit there, would inevitably be offensive to the much less numerous inhabitants of the vicinity. With this knowledge they authorized what the plaintiff in error has been doing. They invited the investment of $250,000 to enable it to be done, and they entered into a contract that the company should have a right to do it for fifty years. To say now, as the judgment in this case does, there was a tacit reservation, that under the pretence of exercising the police power of the State the rights of the company may all be taken away, and their investments destroyed without compensation, is, in my opinion, not only unjust, but unwarranted by any judicial

decision heretofore made. While saying this, I freely admit that the police power of the State may remain to regulate the conduct of the company's business, provided the regulation does not extend to the destruction of the chartered rights. It may prescribe that the offal shall be transported to the appellants' works in closed cars or wagons. It may impose reasonable regulations upon the disposition of the offal when received at the rendering works, but under the cover of regulation it cannot destroy.

Nothing, I admit, is more indefinite than the extent or limits of what is called police power. I will not undertake to define them. Certainly it has limits. I refer to what Judge Cooley has said in reference to the exercise of the power over private corporations. Cooley, Const. Lim. 577. He says, " The exercise of the police power in these cases must be this: the regulations must have reference to the comfort, safety, or welfare of society ; they must not be in conflict with any of the provisions of the charter, and they must not, under the pretence of regulations, take from the corporation any of the essential rights and privileges which the charter confers. In short, they must be police regulations in fact, and not amendments of the charter in curtailment of the corporate franchise." This I understand to be entirely correct. In support of it he refers to numerous decisions, which I will not cite, but to which I also refer. There are many others fully sustaining the text as I have quoted it.

There is no authority to the contrary. The cases relied upon to uphold the exercise of the power which the defendants in error assert are all clearly distinguishable. They are not cases where the police power was exerted for the destruction of a chartered right distinctly granted by a contract.

The only decision referred to which has been made by this court is *Beer Company* v. *Massachusetts, supra,* p. 25. In my judgment, it furnishes no support for the present ruling. The case was this : In 1828, the legislature granted a charter to the Boston Beer Company, by which they were made a corporation, " for the purpose of manufacturing malt liquors in all their varieties," and made the corporation subject to all the duties and requirements of an act passed on the 3d of March,

1809, entitled " An Act defining the general powers and duties of manufacturing companies," and the several acts in addition thereto.   The general manufacturing act of 1809 contained a provision that the legislature might from time to time, upon due notice to any corporation, make further provisions and reg ulations for the management of the business of the corporation and for the government thereof, or wholly to repeal any act or part thereof establishing any corporation, as should be deemed expedient.   In 1829, the act of 1809 was repealed, with the following qualification, however : " But this repeal shall not affect the existing rights of any person or the existing or future liabilities of any corporation, or any members of any corporation now established, until such corporation shall have adopted this act and complied with the provisions herein contained." The legislature of the State, in 1869, passed an act restricting the sale within the Commonwealth of any malt liquors, and prohibiting it except in certain specified cases.

The Supreme Judicial Court of the State adjudged : first, that the act of 1869 did not impair the obligation of the contract contained in the charter of the beer company, so far as it related to the sale of malt liquors, but was binding upon the company to the same extent as on individuals.   The sale was not expressly authorized, nor authorized by necessary implication.   And, secondly, the court held that the act was in the nature of a police regulation in regard to the sale of a certain article of property, and is applicable to the sale of such property by individuals and corporations, even when the charter of the corporation cannot be altered or repealed by the legislature.

We affirmed the decision of the State court.   But there was nothing in the charter that authorized, either expressly or by necessary intendment, the company to sell their product within the Commonwealth.   It was not a contract to authorize what was a nuisance when it was granted, or what might thereafter become one.   It was not a contract respecting any thing that was illegal when the contract was made.   The contract under consideration in the present case was.   It was made with reference to the exercise of the State's police power, and in restraint of it.   It is obvious, therefore, the beer com-

pany's case has no applicability to the one we have now in hand.

I have said enough to indicate the reasons for my dissent. To me they appear very grave. In my judgment, the decision of the court denies the power of a State legislature to legalize, during a limited period, that which without its action would be a nuisance. It enables a subsequent legislature to take away, without compensation, rights which a former one has accorded, in the most positive terms, and for which a valuable consideration has been paid. And, in its application to the present case, it renders it impossible to remove from Chicago the vast bodies of animal offal there accumulated; for if the ordinance of Hyde Park can stand, every other municipality around the city can enforce similar ordinances.