Rockingham, {
July 27, 1894. }

## STATE v. GRIFFIN.

Doe, C. J. Law "is a *rule:* not a transient sudden order from a superior to or concerning a particular person; but something permanent, uniform, and universal. Therefore a particular act of the legislature to confiscate the goods of Titius, or to attaint him of high treason, does not enter into the idea of a municipal law: for the operation of this act is spent upon Titius only, and has no relation to the community in general; it is rather a sentence than a law." 1 Bl. Com. 44.

In some states, the growing evil of special legislation has been met by a constitutional amendment prohibiting it in cases for which provision can be made by general law, and requiring that laws of a general character be made by general law, and requiring that laws of a general character shall have a uniform operation throughout the state. Cooley Const. Lim. 152 n. 1, 129. In this state legal effect has been given to the general declarations of the bill of rights in which uniformity and equality are laid down as a rule of government, and such an amendment would be a mere enactment of our settled construction.

In 1827, the justices, answering a question proposed by the House of Representatives, expressed the opinion that "the legislature cannot authorize a guardian of minors, by a special act or resolve, to make a valid conveyance of the real estate of his wards." "Under our institutions all men are viewed as equal, entitled to enjoy equal privileges, and to be governed by equal laws. If it be fit and proper, that license should be given to one guardian, under particular circumstances, to sell the estate of his ward, it is fit and proper that all other guardians should, under similar circumstances, have the same license. This is the very genius and spirit of our institutions. And we are of opinion, that an act of the legislature to authorize the sale of the land of a particular minor, by his guardian, cannot be easily reconciled with the spirit of the article in the bill of rights which we have just cited," *Opinion of the Justices*, 4 N. H. 565, 573, 574. Notwithstanding the prevalence of a different view elsewhere (Cooley Const. Lim. 115, 122,) the opinion given in 1827 has been accepted in this state as sound, and the reasoning on which it was based has been applied to other classes of cases. *McDuffee* v. *Railroad*, 52 N. H. 430, 454, 455; *Greenville* v. *Mason*, 53 N. H. 515, 518; *Bowles* v. *Landaff*, 59 N. H. 164, 194, 195; *Gould* v. *Raymond*, 59 N. H. 260, 275, 278; *State* v. *Company*, 60 N. H. 219, 236, 238, 250, 251, 256; *Wooster* v. *Plymouth*, 62 N. H. 193, 217; *State* v. *Pennoyer*, 65 N. H. 113, 114, 115, 117.

A lack of uniformity may result from the exercise of limited powers of local government granted to towns and cities. Cooley Const. Lim. 207, 223-231, 281, 282; *State* v. *Hayes*, 61 N. H. 264; *Lewis* v. *Webb*, 3 Me. 326; *Wally's Heirs* v. *Kennedy*, 2 Yerg. 554, both quoted in Cooley 483, note 2. How far a lack of uniformity can be introduced in this way, is a question not raised in this case. The delegation of such powers assumes that by their exercise and non-exercise different municipalities may, to some extent, be governed by different laws. Something prohibited in Portsmouth may be prohibited in Concord under a greater or less penalty. Blowing horns and bugles, tolerated in Nashua, may be suppressed in Manchester. Slaughter houses may be regulated in Rochester in a manner unknown in Keene. Whatever may be the limit of such diversities under local law, they are not tests or samples of equal rights under general law. If they were, petty larcenies and assaults, made penal offences in the County of Merrimack, might be lawful recreations in Rockingham. Felonies in Coos might be misdemeanors in Cheshire. Murder in the first degree, punished by death in Claremont, might be punishable

by nothing more than a nominal fine, or not punishable at all, in Dover. In a case tried not long ago in the County of Strafford, the question whether the defendant was punishable by death or imprisonment depended upon the issue whether an undoubted murder was committed in New Hampshire or Maine. With no requirement of uniformity, there might be ten systems of criminal and civil law in our counties; there might be hundreds of complete codes of so-called New Hampshire State law (one for each town), governing all the relations and rights and duties of mankind, and as different as the laws of Maine, Georgia, Mexico, Europe, Asia and Africa. If the State could be legally reduced to this condition, we should search the constitution in vain for a clause forbidding the enactment of hundreds of thousands of codes, one for each family or person, with all possible differences and contrarieties. It might be enacted in express terms that the malicious and premediated killing of A by B should be a capital offence, and that the similar killing of B by A should not be criminal. There is no difference, in legal or constitutional principle, between such a statute and the act of '91 on which this defendant is prosecuted; and no sound distinction can be established between the two cases. Instead of equal rights, there could be all the inequalities that human ingenuity could devise.

This would not be a state of law in the sense explained by Blackstone, and by the reservations of the bill of rights which limit and define the legislative power vested in the senate and house by the second article of the Constitution. Without uniformity there is no equality. Without equality there is no law in the constitutional sense in which the word "law" is used in this state. This sense has been so often declared here and so long and so vigorously maintained, that it cannot be considered an open question, except in a constitutional convention where a proposed revolution in the fundamentals of government can be properly discussed. There may be exceptional cases, and questions of the application of the principle of a degree of uniformity indispensable to equal rights; but the general rule as a principle of state legislation must be regarded as settled.

The common law is uniform. A right to make a reasonable use of brooks and rivers is a part of the land title of all riparian proprietors. The tributaries of Lake Massabesic are not an exception. The defendant, as assignee of a lease of a mill privilege on a brook that flows into the lake, has the rights of a riparian proprietor. A right to make a reasonable use of the brook, during his term, is a part of his interest in the land. At common law, between him and persons ex-

ercising their right to a reasonable use of the lake, or of the stream flowing from the lake, the question whether his throwing saw dust into the brook was a reasonable use of the brook is a judicial question of fact. *Hayes* v. *Waldron*, 44 N. H. 580; *Green* v. *Gilbert*, 60 N. H. 144. What might be reasonable on a brook running through an un-- inhabited country into the ocean might be unreasonable on a tribu-- tary of the lake from which the people of Manchester obtain the water they use for domestic purposes. If his saw dust became a nuisance, there would be ample remedy in equity without a statute. The ele-- mentary law laid down in *State* v. *Saunders*, 66 N. H. 39, 81 affords ample protection for Manchester, and that without delay. But on a bill in equity, as in a suit at law, the defendant is entitled to be heard before the value of his property is seriously impaired by a judgment. The opportunity to be heard, which is a part of the definition of a judicial proceeding by which rights are determined, is not an element of legislation. Statutes can be enacted without a hearing and without notice. *In re School-Law Manual*, 63 N. H. 574-576; *Opinion of the Justices*, 63 N. H. 625. If one of two riparian proprietors, A, can obtain a perpetual injunction from the legislature against the use made by his neighbor, B, of a stream flowing through their lands on the ground that the use is unreasonable, how can it be held that all judicial questions are not determinable in the same way? It is a course that has great advantages for favored and powerful persons. One who can obtain final judgments against his neighbors *ex parte* occupies a peculiar position. If all judicial questions can be decided by the legislature, they can be decided without either party being heard, and the theory of legal rights hitherto supposed to be indisputable gives way to the doctrine that any one having a judicial question with his neighbor has a choice of remedies. He can go to court, have the defendant notified to appear where a fair trial can be had, or he can apply to the legislature who can if they choose, without a trial, render a decision in the form of a statute that will be as conclusive as a judicial judgment. It is not enough to show that the system is the logical result of decisions in other jurisdictions. It is necessary to show on what New Hampshire ground we are to overturn the different system of government that prevails here. Going to the legislature for a statutory judgment is not a matter of imagination. It is precisely what has happened in this case.

The defendant's land title includes a right to a reasonable use of the brook that carrries his mill; and if he has been deprived of his common law right to a judicial determination of that part of his title,

he has lost it by the act of 1891 (*c*. 26). The act of 1885, *c*. 90 made it a criminal offence to place any substance in any lake or pond, or stream tributary thereto, from which the water supply of any city, town or village is taken for domestic purposes, that may cause the water thereof to become impure or unfit for the uses for which it is intended. This was a general law, and it is the law now (see 1895, *c*. 76) for all waters, except Massabesic and its tributaries and for all persons except riparian owners on that lake and its tributaries. With that exception it operates uniformly and maintains equality of right throughout the state, and leaves the judicial question of the effect of saw dust and other substances for trial as at common law. It throws the cost of prosecution on the counties, and adds criminal penalties to the common law means of maintaining the riparian right to pure water. There was a desire in Manchester to avoid the necessity of proving the injurious effect of saw dust in the water used by the city. For some reason that particular substance was selected as one in relation to which the question of reasonable use was to be transferred from the judicial to the legislative jurisdiction. It might be supposed that a privy over a tributary of Massabesic, or a pig sty on the bank, would be a clear case of unreasonable use. It may have been considered improbable that any defendant would demand a trial of the question of the reasonableness of such uses. A legislative decree may have been desired only in those cases in which defendants would be likely to insist upon their constitutional right to a judicial trial.

Not only were one substance and one use selected and condemned as unreasonable without trial, but one body of water was selected, and the proprietors on its tributaries were subjected to a special disability from which all other riparian owners in the state in the same situation are exempt. No others are deprived of the right to a judicial trial of the question of reasonable use. It is not material whether such discriminations can be accomplished by the exercise and non-exercise of public power delegated by the state to local governments. The unequal rights introduced by the principle of local self government are exceptional. They stand apart by themselves, in no way connected with, and in no way sustaining, unequal rights under general law. If another exception can be grounded on necessity, it is immaterial in this case. Here was no necessity for special legislation limited in its operation to one locality. In the first place, no statute was necessary to maintain the right of Manchester to pure water from the outlet of Massabesic. The common law is ample for

that purpose. In the second place, if the water supply of Manchester needs a saw dust law, the water supplies of towns in the same situation need the same law. If an infusion of saw dust is unwholesome for the people of Manchester, it is unwholesome for other people. If legislation on this subject can be special and local, there is no subject on which it must be general and uniform. If Massabesic can be selected by a state law for protection unknown elsewhere, the well of a Massabesic farmer can be protected by a penal enactment applicable to no other well. In *State* v. *Buckman*, 8 N. H. 203, the defendant was convicted of the common law offence of putting the carcass of an animal in a well of water. All wells, springs and brooks, from which the owners and their families take their supply of water for domestic purposes are equally entitled to protection. A statute making it a felony or misdemeanor to put saw dust or other substance in the well of A. B. of Haverhill, and leaving all other wells in the state protected by the common law alone, would be valid if the act of '91 is valid in giving Manchester a protection against saw dust that is not given to anybody else in the same situation. Under a state law, equality is a right or the construction repeatedly put upon the constitution by the court from 1827 to the present time is a false pretence. The doctrine that gives one person or family or the people of one town against assaults and burglaries, against poisonous air, poisonous foods, poisonous drinks, or moral poison, a protection by state law that is denied to all other persons, families and peoples in the same circumstances, is as odious a discrimination as is recorded in the history of despotic governments.

A state law selecting a person or class or municipal collection of persons for favors and privileges withheld from others in the same situation, and selecting one or more riparian proprietors on one pond and its tributaries for deprivation of the right of a trial of a question of fact involving a part of their land title, and leaving that right undisturbed in all proprietors in the same situation is at war with a principle which this court is not authorized to surrender. 3 Me. 326; 2 Yerg. 554.

Uniformity and equality of rights are necessary for the safety of every citizen. It would be comparatively easy to invade the rights of a feeble person, a feeble party, or a feeble sect, if uniformity and equality were not an element of law in the legal sense. In 1859, a Maryland act provided that "no Black Republican or endorser or supporter of the Helper Book, shall be appointed to any office" under the board of police. The court declined to express an opinion on the

validity of the act on the ground that they could not understand officially who were meant by Black Republicans. *Baltimore* v. *State,* 15 Md. 376, 468. The persecuted were helpless because the court didn't know them. When a Tennessee act required in certain cases the affidavits of three unconditional Union men, the court had no difficulty in holding it void. Cooley Const. Lim. 481 *n.* There is no limit to the injustice and tyranny that can be practiced if uniformity and equality are not essential parts of law. Any man may have the misfortune to entertain unpopular opinions on a variety of subjects. Any family or neighborhood, for a great variety of reasons, may encounter hostility in public opinion. On subjects that disturbed the country in 1861, subjects that disturb it now, and many others that may disturb it hereafter, the mass of residents of a town or city may be regarded with strong disfavor by a legislature entertaining strong opinions.

If the power of discrimination can be exercised by special laws, no one knows how soon he and his neighbors may become the victims. Without equality nothing is secure. The settled constitutional right of equal privileges and equal protection under general law rests on incontestable grounds of wisdom and necessity. The equal protection of the laws recently inserted in the federal constitution has been a New Hampshire doctrine 110 years; and it has been maintained here in a breadth of meaning and a scope of practical operation unknown elsewhere. The New Hampshire view is more nearly expressed in the dissenting opinions in the slaughter house cases, 16 Wall. 36, than in the opinion of the majority. *Fertilizing Co.* v. *Hyde Park,* 97 U. S. 659, is a case of local government. Whatever may be done by state law in that doctrine in cases of necessity, the right of equality does not exist if a state law like the ordinance of Hyde Park can be made without necessity. In the language used by this court in 1827, "Under our institutions all men are viewed as equal, entitled to enjoy equal privileges, and to be governed by equal laws." 4 N. H. 573. With a slight paraphrase, the doctrine of equal rights applied on that occasion, is applicable in the form there expressed to this case. "If it be fit and proper that protection against saw dust should be given by a state law to one town, under particular circumstances, it is fit and proper that all other towns should, under similar circumstances, have the same protection. This is the very genius and spirit of our institutions."

In *Rice* v. *Parkman,* 16 Mass. 326 (decided in 1820) it was held that the legislature, by a special act, can license the sale of a minor's prop-

erty by his guardian, notwithstanding the power of a court to grant the same license. This rule, adopted in Massachusetts seven years before the opposite doctrine was held here, has been generally adopted in other states. *Rice* v. *Parkman* is the leading case. Cooley Const. Lim. 115-122. It is to be noticed that our constitution which was held in 1827 to require uniformity and equality in the rights of guardians to sell their wards' property, and therefore to prohibit a legislative grant of authority in a particular case, is a copy, in all material points, of the Massachusetts Constitution under which the contrary was held seven years before. And when we consider that the Massachusetts' doctrine has been generally adopted throughout the Union in preference to ours, and that special legislation on all subjects became so great an evil as to require a prohibition of it by constitutional amendment, we have a view of the question whether it is expedient to reverse our course and bring in the evils of special legislation that have been found unendurable in other states, for the purpose of putting the people in this state to the trouble of reversing our error by constitutional amendment.

Following the doctrine of *Rice* v. *Parkman*, it is held that the legislature, by special act, can authorize the sale of a particular piece of trust property. 119 Mass. 1, 26, 27; Gray Perpetuities, *s.* 590, *n.* 3. A legislative administration of justice in other cases (2 Pet. 627, 12 Wheat. 370, 377, 378) is "utterly repugnant to the whole course of our judicial decisions," says Judge Bellows in 39 N. H. 387.

One of two classes of physicians, differing only in respect to residence, cannot be subjected to the expense of obtaining a license from which the other is exempt. *State* v. *Pennoyer,* 65 N. H. 113. Two recent decisions, holding the contrary, are cited in Cooley Const. Lim. 484 *n.* In *State* v. *Pennoyer* (*p.* 114) are cited seventeen New Hampshire decisions on the subject of equal rights in the matter of taxation,—a subject on which the uniformity and equality required by the established construction of our constitution is in striking contrast with the inequality and injustice that prevail elsewhere. An examination of the authorities shows an unconstitutionality of unequal rights in this state, and the constitutionality in other jurisdictions, state and national, to such an extent that on a question of this kind the authorities that maintain inequality elsewhere are entitled to no weight here. It is one of the subjects on which the policy of the state is too firmly established to be changed by this branch of the government. Admit for the purpose of the argument all that may be said of the peculiarity of the New Hampshire doctrine of constitutional

equality. And admit that it is wrong and opposed to the common welfare and that despotic power with boundless partiality and discrimination as practiced in various regions of the East is more conducive to the interests of the community, and that the constitutional amendments prohibiting special legislation in other states are mistakes that ought to be corrected. All this, taken for granted, would not affect this case, the decision of which is determined by legal reasons as conclusive as those which require us to adhere to the construction that "trial by jury" means trial by twelve men giving a unanimous vote, whatever may be the opinion of the court on the question whether trial by a smaller number deciding by major vote would be better. Constitutional construction fixed by the reported decisions of sixty-seven years is not to be dealt with like unimportant forms of procedure, or English rules of law that are not adapted to the situation and circumstances of this country. On questions concerning the foundations of society where a system of government has lasted more than a century, the ancient landmarks cannot be removed by judicial decisions.

*Complaints quashed.*