CLEVELAND ELECTRIC RY. CO. v. CITY OF CLEVELAND et al.

(Circuit Court, N. D. Ohio, E. D.   April 24, 1905.)

No. 6,851.

1. STREET RAILROADS—FRANCHISES—LIMITATIONS—MUNICIPAL CORPORATION—POWERS.

· A municipal corporation entitled to grant a street railway franchise had power to limit the grant as to time, prior to the passage of Act Ohio May 14, 1878 (75 Ohio Laws, p. 360), providing that no grant or renewal of a grant shall be valid for a greater period than twenty-five years, though prior to the passage of such act there was no statute authorizing the municipal corporation to limit such grants.

[Ed. Note.—For cases in point, see vol. 36, Cent. Dig. Municipal Corporations, § 1469; vol. 44, Cent. Dig. Street Railroads, § 42.]

2. SAME—CONTRACT RIGHTS—SURRENDER—UNLIMITED FRANCHISE.

Where a street railway company, having an alleged unlimited franchise to operate a line on a certain street, granted prior to the adoption of 75 Ohio Laws, p. 360, limiting such grants to 25 years, accepted the terms of a subsequent ordinance authorizing it to extend its line on such street, and to equip and operate such extension and all of its tracks on such street for a period of 25 years, the acceptance of such ordinance operated as a surrender of its alleged unlimited franchise as to such street.

3. SAME—JUDGMENTS—ESTOPPEL—RES ADJUDICATA.

Where a street railway company was compelled by action of the public to defend itself in court against a present claim of misuser of its franchise, mere reasons presented by it in argument in such action, though inconsistent with its subsequent claim as to the continuance of its franchise, did not amount either to an estoppel or establish a claim of res judicata.

[Ed. Note.—For cases in point, see vol. 19, Cent. Dig. Evidence, §§ 165–168.]

4. SAME—CONSOLIDATION OF LINES—EFFECT.

Neither the consolidation of street railway lines into one company and one system, nor transfer obligations imposed by an ordinance authorizing the laying of an additional line on another street, operated to prolong the life of any prior franchise.

5. SAME—EXTENSION OF FRANCHISE BY IMPLICATION—ORDINANCE—TITLE.

Where none of the titles of several city ordinances granting street railway extensions contained any intimation of a purpose to deal with the subject of the life of the original grant, though the "subject" of the ordinance was required to be "clearly expressed in its title," an extension of the main franchise could not be implied therefrom.

6. SAME—PERMISSION TO EXTEND TRACKS—EFFECT.

Ordinance granting a street railway company permission to extend tracks and operate them "in connection with the main line" for a period which endures longer than the right to operate the main line did not operate as extending the main-line franchise, regardless of whether such extensions were capable of independent operation.

7. SAME—DETERMINATION OF FRANCHISE.

Where a street railway company operating lines on various streets, under franchises which expired at different times, accepted an ordinance authorizing the substitution of electricity for horse power on its G. Street branch, and providing that the right to operate such branch should continue during the term of the company's then present grant for the operation of the tracks on such branch, the ordinance fixed a uniform period for termination of the franchise of the G. street line over its entire length, as extended under a prior ordinance, and therefore abrogated any prior contract for the operation of an extension of the G. street branch for a period longer than the expiration of the G. street franchise.

8. STATUTES—CONSTRUCTION—EXTENSIONS—AUTHORITY OF MUNICIPALITY.

Rev. St. Ohio, §§ 2501, 2502, provide for the granting of original street railway franchises, after advertisement on public bids, to the corporation which will agree to carry passengers at the lowest possible rates of fare, and shall have previously obtained the written consent of a majority of the property holders on the several streets along the proposed route, provided that no street railway grant, or renewal of a grant, shall be valid for a longer period than 25 years. Section 2505 authorizes the city council to grant any street railway corporation power "to extend its track," subject to the provisions of sections 3437–3443, none of which, however, relates to the establishment of a route or a renewal of a grant, and did not require such extensions to be on competitive bidding, etc. Held, that an extension granted under such sections is not a "new route,"

having an independent life, but depends for its existence on the original line, and expires with the franchise thereof.

9. SAME—DOUBLE-TRACKING LINE—VALIDITY.

Where a city council established a street railway route, and granted a franchise for the operation of the road, as provided by Rev. St. Ohio, §§ 2501, 2502, the city council had no power, by merely giving the corporation the right to double-track its lines, to confer power on the railroad company to operate the second track for a period beyond the term of the franchise of the line double-tracked.

## In Equity.

The complainant files its bill against the city of Cleveland and the Forest City Railway Company, alleging that the enforcement of a certain ordinance of the city of Cleveland will violate the complainant's rights under the Constitution of the United States, especially by impairing the obligation of its contracts with the city; asking that the ordinance be decreed to be null and void; and, alleging that irreparable injury will be done to it by enforcing the ordinance, and that it has no adequate remedy at law, prays that the defendant the city of Cleveland, its officers, agents, attorneys, etc., be now temporarily, and hereafter perpetually, enjoined from putting the ordinance alleged to be illegal into effect. The bill sets out the corporate history of the complainant, and the several ordinances of the city upon which its right to operate a street railroad is based, and especially in relation to its right to operate a street railroad on what is called its Garden street (now Central avenue) line, which is the immediate subject of this controversy. An amendment to the bill was filed before the hearing, but this will be treated and spoken of in this opinion as part of the bill itself. Upon the filing of the bill a temporary restraining order was allowed ex parte, and the case is now before the court upon the application for a temporary injunction. The defendants have fully answered, all of the ordinances and other facts affecting the question before the court have been presented, the case has been most ably and elaborately argued, and this hearing, so far as this court is concerned, is practically a hearing on the merits.

The complainant, by consolidation with other companies and by purchase of other lines, is now the owner of about 236 miles of street railway track in the city of Cleveland, comprising practically all of the street railway mileage within the city. The East Cleveland Railroad Company is the constituent company to which, prior to the consolidation, all of the rights involved in this proceeding were granted. This corporation—that is, the East Cleveland Railroad Company—was incorporated in the year 1859, and in the course of the following three years received grants, by ordinance of the city of Cleveland, for the operation of a line beginning at what was then the easterly city limit, at Willson avenue; thence by way of various streets to and through the Public Square to Water street. These grants were made to expire September 20, 1879, and under them a street railroad was constructed. In 1862, the East Cleveland Railroad Company was granted by the township trustees of East Cleveland township the right to construct a single street passenger railway track from the Willson avenue terminus of its line, in the city of Cleveland, eastwardly along Euclid street (now Euclid avenue), a distance of about two miles, to Doan's Corners. There was no time limitation to this grant, and under it a street railroad was constructed and put in operation. Prior to January 14, 1868, the East Cleveland Railroad Company applied to the city council of the city of Cleveland for leave to construct a street railroad from the intersection of Prospect and Brownell streets, to connect with the main line of its railroad; thence along the center of Brownell street to its intersection with Garden street; thence easterly along the center of Garden street to and across Willson avenue to the easterly boundary of the city. The requisite consents of the property owners were filed, bond in the sum of $20,000 was given, bids were filed as required by the statute, and the council declared by resolution that the bid of the East Cleveland Railroad Company "provided for the lowest rates of fare for carrying passengers on the proposed line," made by any company or individual. There-

137 F.—8

upon, on January 14, 1868, the council passed a resolution giving to the East Cleveland Railroad Company permission to lay down a track on the streets named in the application, and to use and occupy the tracks, switches, and turn-outs during the period of 20 years, and also the right to continue to use and occupy the streets, avenues, and public grounds over which its main line was then constructed and operated, westerly from the junction of the Garden street branch with the main line to its western terminus (that is to say, Water street), for the same length of time. Thus originated the line which is the subject of this litigation. On January 16, 1868, the railroad company filed its acceptance of "the grants and permits to construct and operate a street railroad from their main track in Prospect Street, through Brownell to Garden, and through Garden Street to the easterly line of the City, in accordance with their petition and bid, and the ordinance and resolution of the Council."

In March, 1868, the village of East Cleveland, which bounded the city of Cleveland on the east at the point where the Garden street branch, as granted by the ordinance of the city of Cleveland, ended, granted to the East Cleveland Railroad Company the right to construct a street railroad, "as a branch of its said railroad," through and along certain streets in the village, beginning at the termination of its branch road at the easterly line of the city of Cleveland, in Willson avenue, for a period of 20 years. This ordinance was accepted by the street railroad company, and the Garden street branch was built, as contemplated by the two ordinances just referred to, extending from Prospect street, at Brownell, to the southerly line of Wade street, at Baden street. The length of this Garden street branch, as thus originally established by the ordinances of the city of Cleveland and the village of East Cleveland, was about two miles. On March 25, 1873, the city council passed a resolution granting to the East Cleveland Railroad Company the right to lay a second or double track in Garden street, between Brownell street and Willson avenue. There are no words in this ordinance limiting the time during which the right should exist.

On May 23, 1876, a portion of the village of East Cleveland having been annexed to the city of Cleveland, the council of the city passed an ordinance entitled "An ordinance to permit the East Cleveland Railroad Company to extend the Garden street branch of its road," which ordinance authorized the railroad company "to extend the Garden street branch of its road to the easterly end thereof, along Garden street to Baden avenue, and along Baden avenue to Quincy street, and along Quincy street to New street, and along New street to Garden street, there to connect with the Garden street track; and to equip and operate said extension for twenty years in connection with said branch and its main line."

On September 15, 1879, the city council passed an ordinance granting a renewal, for the period of 25 years from and after September 20, 1879, of the right to operate a street railroad in and along Superior street, Euclid avenue, Erie street, Prospect street, Case avenue, and Euclid avenue. This is what is sometimes in the ordinances referred to as the "main line" of the East Cleveland Railroad Company.

On March 20, 1880, the city council passed an ordinance entitled "An ordinance to permit the East Cleveland Railroad Company to extend the Garden street branch of its railway," which, omitting the formal parts, is, in full, as follows:

"Section 1. Be it ordained by the city council of the city of Cleveland, that the East Cleveland Railroad Company be and is hereby authorized and empowered to extend the Garden street branch of its railway from the present track, at the intersection of Baden avenue and Quincy street, in an easterly direction on and along said Quincy street, to the intersection of Lincoln avenue, and to equip and operate the said extension and its Garden street branch for the period of twenty-five years from and after the passage of this ordinance; but with the express condition that no increase of fare shall be charged by said company on any part of its said branch, or of its main line, or of said extension by reason of said extension. This grant is made subject to all ordinances of said city council now in force, or which may hereafter be duly passed regulating street railroads.

This is the ordinance which the city claims is the only ordinance under authority of which the Garden street branch is now operated. It expired on the 22d day of March of the present year.

On February 9, 1885, the city council passed an ordinance entitled "An ordinance to permit the East Cleveland Railroad Company to extend the Garden street branch of its railway," by which it authorized the railroad company "to extend the Garden street branch of its railway from the termination of its present track at the intersection of Quincy street and Lincoln avenue in an easterly direction on and along said Quincy street to Woodland Hills avenue and equip and operate said extension as a single-track railroad, with all necessary switches, * * * in connection with said branch and its main line, and terminating with the grant for the main line," etc.

At this time the Garden street franchise ran to March 22, 1905, and the "main line" franchise to September 15, 1904.

On June 18, 1887, an ordinance was passed entitled "An ordinance to permit the East Cleveland Railroad Company to extend the Garden street branch of its railway," by which the railroad company was authorized "to extend the Garden street branch of its railway from the intersection of its present track with Baden avenue, upon Garden street, in an easterly direction along and upon said Garden street to the easterly line of Lincoln avenue, and equip and operate said extension, * * * in connection with said branch and its main line, and terminating with the grant for the Garden street main line."

July 13, 1888, an ordinance was passed extending the franchise of the Euclid avenue line (sometimes called "main line") to July 13, 1913.

On March 10, 1890, an ordinance was passed, entitled "an ordinance granting the East Cleveland R. R. Co. the right to substitute electric motive power for horse power upon its Garden street branch." Section 1 of this ordinance is as follows:

"Section 1. Be it ordained by the city council of the city of Cleveland, that the East Cleveland R. R. Co., its successors or assigns, is hereby authorized and granted the right to operate its Garden street branch by electricity, i. e. from the intersection of Prospect and Erie streets, along Erie street to Ohio street, along Ohio street to Brownell street, along Brownell street to Garden street, and along Garden street to Lincoln avenue; also along New street from Garden street to Quincy street, and along Quincy street to Woodland Hills avenue, and authority is hereby granted said company to erect and maintain on said streets all necessary poles and wires, and the necessary appliances and fixtures for the conducting of electric currents to operate by electric motive power the said Garden street branch during the term of its present grant for said Garden street branch. All poles erected under this ordinance to be of iron unless otherwise ordered by the board of improvements."

On April 4, 1890, the East Cleveland Railroad Company accepted the above ordinance, and agreed "to abide by the provisions, conditions, limitations and restrictions contained in said ordinance."

On March 20, 1891, an ordinance was passed authorizing the East Cleveland Railroad Company to lay and operate a second track on Central avenue (formerly Garden street) from the east line of Willson avenue to the Cleveland & Pittsburgh Railroad tracks; and it was provided by section 4 of the ordinance that "the right herein granted shall be valid until the expiration of the grants for the company's main line."

On April 20, 1891, the council passed an ordinance granting to the East Cleveland Railroad Company permission to lay an additional track in Quincy street, from New street to Woodland Hills avenue, authorizing the company to connect the additional track with the tracks then laid upon New street, and providing that the right therein granted should be valid "until the expiration of the grants for said company's tracks in Quincy street east of Lincoln avenue, to wit, July 13, 1913."

On March 25, 1893, the Cleveland Electric Railway Company was organized, by the consolidation of the East Cleveland Railroad Company and the Broadway & Newburg Street Railway Company, and subsequently it was further enlarged by consolidation with two other street railroad companies.

On February 19, 1894, an ordinance was passed granting permission to the Cleveland Electric Railway Company and the Cleveland City Railway Company to extend their tracks in Willson avenue. Willson avenue is a cross-town street, and crosses the various tracks of the Cleveland Electric Railway Company and the Cleveland City Railway Company at many points, including the tracks of the Central avenue (formerly Garden street) line. Section 6 of this ordinance provides as follows: "A passenger on any car operated on any part of said Willson avenue, on payment of one fare, either in cash or by ticket, shall be entitled, without additional or extra charge, to be transferred to any other line of either of said companies intersecting or coming to said Willson avenue, including the lines on Broadway, and to have a continuous ride thereon, with the right, without additional or extra charge, to be transferred from such second line to a car on any other line of the company operating the same which crosses the Cuyahoga river, and passengers on any line of either of said companies intersecting or coming to said Willson avenue, including the lines on Broadway, shall be entitled, without additional or extra charge, to be transferred to said Willson avenue line and to have a continuous ride thereon. The council shall at all times have the right to prescribe rules and regulations in respect to the transferring of passengers as provided for in this action."

On July 2, 1894, the council passed an ordinance granting to the Cleveland Electric Railway Company the right to extend and operate its street railroad in Quincy street, from New street to Willson avenue. The distance between these two points is very short, the purpose being to permit a connection between the two tracks. Section 6 of this ordinance provides as follows: "This grant shall terminate with the grant for said company's present line in Quincy street."

On August 8, 1901, the council passed an ordinance granting to the Cleveland Electric Railway Company the right to lay a track along the easterly side of the Public Square, and the right to use the tracks of the Cleveland City Railway Company on Superior street from the westerly side of the Public Square to Erie street. Section 4 provides: "This grant shall expire on March 22, 1905, unless it be sooner terminated by the city, and the city reserves to itself the right to terminate it at any time," etc. The purpose of this ordinance was to facilitate the transportation of passengers in the congested part of the city.

The result of the various consolidations of companies and acquisition of properties has been to establish one system throughout the city, over which only one fare is charged for a continuous ride, with certain privileges of transfer.

On January 11, 1904, the city granted to the Forest City Railway Company "the renewal right to maintain and operate the existing street railroads," namely, the Garden street line. No question is made, and it is stated by counsel on both sides that no question can be made in this court, as to the validity of this ordinance, except on the ground that, as to the complainant, it is in violation of the Constitution of the United States.

Squire, Sanders & Dempsey, for complainant.
Newton D. Baker, City Sol., for defendant city.
Garfield, Howe & Westenhaver, for defendant Forest City Ry. Co.

TAYLER, District Judge (after stating the facts). The complainant bases its claim to relief on several grounds, which are, I think, fairly stated as follows:

First. (1) That since, prior to the act of 1878, the Legislature had not delegated to the municipality the right to limit the term of a street railroad franchise, and as the Legislature has not since that time withdrawn from any street railroad company enfranchised prior to 1878 the rights it had thus acquired, the act of the city council and of the council of the village of East Cleveland in limit-

ing the term of the complainant's predecessor's rights to 20 years was invalid, and that the franchise of the company's "main line" is unlimited. (2) That, for the same reason, since the trustees of East Cleveland township gave an unlimited and original franchise to the East Cleveland Railroad Company, that franchise still endures. (3) That since, as claimed, the right to operate the Garden street (Central avenue) line, or at least a part of it, is made to expire with the expiration of the franchise on the "main line," such right is now held in perpetuity or for an unlimited period.

Second. That by reason of the consolidation of the companies, and the creation of a "system" over which there is a right to ride for one fare for a continuous passage, however long, with certain transfer rights, the system must be considered as a unit, with a period of expiration fixed at the date of the last expiring franchise.

Third. That, because of the obligations imposed by the Willson avenue ordinance—especially by section 6, requiring transfers at the intersection of the Central avenue and the Willson avenue lines —a right arises corresponding to the duty imposed; and since the Willson avenue franchise will last until 1914, and the duty to transfer at Central avenue continues until that time, the right to operate the Central avenue line is extended, by implication, to that date.

Fourth. (1) That the original Garden street (Central avenue) grant was for an "extension," and not a new route, and that the granting of the right to operate the several "extensions" thereto "in connection with the main line," or "in connection with the Central avenue branch," to a time beyond the expiration of the right previously given to the "main line" or to the Central avenue branch, operated to extend the time of expiration of the franchise of the main line and of the branch, and that this is true whether by "main line" is meant either the Euclid avenue line, or what is called the "Garden street branch." (2) That some of the Garden street ordinances—some for "extensions" and some for laying additional tracks—provide for an expiration the same as for the "main line," and that, as to the ordinance for double-tracking on Quincy street east of Lincoln avenue, it is explicitly provided that the grant should be valid until "the expiration of the grants for said company's tracks on said Quincy street east of Lincoln avenue, to wit, July 13, 1913," and that, by the clear implication of the language, we must conclude that not only does the right to operate the line east of Lincoln avenue run until 1913, at least, but that the whole Garden street line must have the same life.

I think I have stated the substance of the claims made by the complainant, and they will be discussed in the order in which they have been given.

1. As to the claim of perpetual or unlimited franchise: Prior to the act of May 14, 1878, the Legislature had given to municipal councils the general power to consent to the use of their streets by street railroads, and to prescribe the terms and conditions of such use. By the act of May 14, 1878 (75 Ohio Laws, p. 360), it is provided that no grant, or renewal of a grant, shall be valid for

a greater period than 25 years. It thus appears that prior to the law of 1878 the Legislature had not undertaken to use the authority which it possessed to put any limit upon the time which might be granted by a municipal corporation to the right of a street railroad company to occupy streets. After that the Legislature withdrew from the municipality all power which it may have had prior to that time to grant such franchises for a period in excess of 25 years. All of the ordinances passed by the city of Cleveland and by the village of East Cleveland, as well those passed prior to 1878 as those passed since that time, fixed a time limitation on the grants and renewals given to street railroad companies. The only unlimited grant is that given by the township of East Cleveland.

The conclusion to which I have come is that prior to the act of 1878 the council of the city of Cleveland had full power to limit the term of a street railroad's franchise to occupy the streets, and that even if it did not have such power, and such limitation was invalid, nevertheless any rights which may have accrued to the predecessors of the complainant, as well as the right to an unlimited franchise which it had from the township of East Cleveland, have been, for valid considerations, yielded up to the city. If we assume that on March 22, 1880, the complainant, or its predecessor in title, had an unlimited grant over some part of its Garden street line, it is clear that, as a property right, it could contract with the city concerning it; for some accruing advantage it could contract to give back to the city such portion of the term of the franchise as might be agreed upon. What was done by the ordinance of March 22, 1880, passed when the council had the power to grant a franchise for a limited term? It was agreed by that ordinance that the company might extend its Garden street line to Lincoln avenue, and "equip and operate its said extension and all of the Garden street tracks" for the period of 25 years. This ordinance was accepted by the complainant, and constituted a contract. If at the time of the passage of this ordinance the complainant had the right to operate any part of the Garden street line after March 22, 1905, that right was yielded up by force of the contract made through the ordinance of March 22, 1880.

Counsel for the complainant cite on this point the case of Citizens' Railway Company v. City Railway Company (C. C.) 64 Fed. 647, and the same case on appeal, 166 U. S. 557, 17 Sup. Ct. 653, 41 L. Ed. 1114. In the Circuit Court, Judge Woods, sitting with District Judge Baker, held that the term of the franchise was unlimited, and also that an additional and unexpired term of seven years had been granted. Judge Baker dissented from the holding that the term was unlimited, but agreed that it had seven years more to run, so that both were of opinion that an injunction should be allowed. The case went to the Supreme Court. There it was held that it was unnecessary to pass on the question of an unlimited grant, because the unexpired term of seven years furnished ground for ample relief. The decree of the lower court was therefore modified by striking out such parts of it as recognized an unlimited

grant. The modified decree was exactly what would have been entered by Judge Baker, and exactly what the Supreme Court would have entered if it had found that there was no unlimited grant. Surely, if the city had the right to grant the use for an unlimited period, it had the right to grant it for a limited period. The greater power would include the less. But apart from that, there was no question in the Indianapolis case arising out of the making of a new contract with the city after the state had delegated to it the power to grant franchises for a limited term. That is the situation here, and that would control the determination of the question before us, even if the Supreme Court had sustained the validity of Judge Woods' decree.

Counsel for the complainant, in support of his contention for perpetual franchise, cites the case of State ex rel. Taylor v. Columbus Railway Company, 24 Ohio Cir. Ct. R. 609. A careful examination of this case shows that, so far from sustaining the contention of the complainant, it is authority against it. This case does not hold that prior to the act of 1878 the council of a municipal corporation was without power to impose a limitation of time on a street railroad franchise. It did hold and does hold that, until the statute imposed the 25-year limitation on the power of the council, a franchise granted without limitation was perpetual, in so far as the power of the council existed to terminate it; the court holding that it could only be dealt with under the reserved power of the Legislature, as granted by the Constitution.

The second proposition of the syllabus is as follows:

"Such consent given prior to said act [that is, the consent of the city to operate a street railway prior to the act of May 14, 1878], without any limitation of time, or to a corporation with succession during the term of its charter, is revocable only by legislative authority."

The third proposition is as follows:

"A franchise or privilege to construct and operate a street railway, granted and consented to prior to said act, without limitation of time, is perpetual, but subject to be determined by the General Assembly under section 2, art. 1, or under sections 1, 2, art. 13, of the Constitution."

In the opinion, on page 621, it is apparent that counsel for the street railroad company recognized that the council might limit the grant. I quote from the opinion:

"The contention of counsel for the defendant [that is, for the street railway company] is that these statutes expressly confer upon municipalities power to grant the right to use the street, and that, the power being unlimited as to the duration of the grant, it is in the discretion of the municipality to grant without limitation, and, if it does, the grant is irrevocable and perpetual."

And again, on page 637, the court says:

"But the right or franchise conferred by the state [prior to the act of 1878] being unlimited as to its duration, and the city, under its power to agree upon the terms and conditions under which the right might be exercised, not having imposed any such limitation, the right continues, subject to be determined only in virtue of the power reserved either by legislation or by the courts by forfeiture."

It therefore appears to have been recognized and held in this case that if, prior to the act of 1878, the council had seen fit to impose a time limitation on a franchise, such limitation would have been valid. That case also passes upon the question of the effect of succeeding ordinances upon the unlimited grants theretofore given. An examination of these ordinances shows that not one of them undertook to fix a time limitation, or indicated in any way, by contract or by implication, that the railway company was yielding up any unexpired term of any previous franchise. For instance, as stated on page 639, the court says:

"It is contended also that in some of the ordinances consenting to double tracks it is provided 'that nothing in this ordinance shall in any wise work an extension of the charter of said railway company,' and that this is an admission by the company that its franchise is not perpetual; that the several ordinances passed subsequently to 1878 repealed former ordinances and made new agreements, and that by acceptance of the latter ordinances the company gave up all rights under the former ordinances; and that, as the latter ordinances were passed subsequently to 1878, the limitation of twenty-five years contained in the act of that year applies; and that contention is made also in respect to ordinances making new or additional agreements, but not expressly repealing former ordinances. These contentions have given us much trouble, because counsel refer to ordinances we are unable to find, either attached as exhibits to the pleadings, or in the agreed statement of facts. However, the alleged admission by the company is immaterial, for it is neither averred nor shown that the action of the city was in any instance procured or influenced by the alleged admission; and, as to the other contentions, if they are good, then they concede that, by the new agreements or ordinances, consent was given for twenty-five years, and a present right to occupy the streets, and, when a right presently to occupy the streets is conceded, we do not consider or determine the moot question of its possible duration."

It is thus apparent that the court did not have before it any ordinance which explicitly put a limitation on the franchise, and, even if it did, it did not pass upon the question, but held that, as there was still time to run, upon the theory of the plaintiff, no practical question arose as to the right to operate its tracks.

The effect of the passage of an ordinance providing for the substitution of electricity as a motive power in place of horse power is referred to on page 640 as follows:

"As to the ordinance authorizing the substitution of electrical power, we may say, in the words of Mr. Justice Brown in City Ry. Co. v. Street Ry. Co., 166 U. S. 557, 569, 17 Sup. Ct. 653, 657, 41 L. Ed. 1114, 'There is nothing in the so-called electrical ordinance which affects this question.'"

Now, an examination of the case referred to, in which Mr. Justice Brown delivered the opinion, discloses that there was nothing touching upon the term during which the right should exist, except the words:

"Nothing herein contained shall be construed so as to lengthen the term of the franchise, enlarge, or in any way change or affect, the rights of the Citizens' Street Railway Company," etc.

The manifest purpose of the insertion of that provision was to leave in statu quo the pre-existing right, so far as duration of franchise was concerned.

Counsel for the city contend that the action of the court in the case of State ex rel. Hadden v. East Cleveland Railroad Company, 6 Ohio Cir. Ct. R. 318, in which this ordinance of March 22, 1880, was under consideration, estops the complainant from now making any claim of the right to a perpetual franchise. There is some force in this contention, but it is not convincing. The main question in that case was whether a renewal could be granted before the expiration of the grant to be renewed. The railway company did not seek the forum, but was compelled by action of the public authorities to go into court and defend itself from a present claim of misuser; and mere reasons presented in argument could not, even if inconsistent with the present claim, amount to estoppel, or make that case res adjudicata as to this question.

The conclusion, therefore, to which I have come in respect to this claim of perpetual or unlimited franchise, is that prior to the act of 1878 the council had the right to limit the term of a franchise, and that, as to any franchise granted for an unlimited period, the rights of the complainant have been wiped out by its subsequent contracts entered into with the city.

2. As to the effect of the consolidation and the creation of a system: I am not at all impressed with the force of this claim. Of course, there are many and obvious advantages in the development of a system. Unity of management and of fares, as well as unity of responsibility, is a thing much to be desired; and the proposition that, on that account, renewals of franchises might come by implication, would be more plausible if it were not for the consequences which would manifestly follow. It is true that with a system, in so far as it is essential that all of its constituent parts should be unified, the right to operate it and all of its parts ought to be co-determinate; but two observations conclusively answer the contention of the complainant: First, that, if there is any control over the life of the system and of its parts, it is the life of the system which must control the life of the parts, not the part the system; second, it is far from the truth that, physically or practically or legally, any one part of the system is essential to the operation and life of the system.

3. The Willson avenue ordinance: The claim that the imposition of certain contract duties by section 6 of the Willson avenue ordinance creates, by necessary implication, a franchise right enduring as long as the Willson avenue franchise, is made. But an examination of that ordinance does not support the contention. It is true that, under the provisions of section 6, it is made the duty of the complainant to transfer passengers to its Garden street line. But the council could not have intended, by so requiring, that such transfers be made by the complainant when the complainant had no Garden street line; and, if it had so intended and had so declared, it would have been invalid. To assume that the city could terminate the right to operate the Garden street line, and make it impossible for the complainant to transfer passengers at the intersection, and then hold the complainant responsible for not transferring them, is to assume an impossibility.

4. (1) We now come to the last and most important of the considerations urged by counsel for the complainant, namely, that the effect of the several ordinances relating to the Garden street (Central avenue) line is to extend the franchise along that line, for its entire distance, until July 13, 1913. This involves an inquiry into the nature of these ordinances and the history of the Garden street line, as well as a discussion of the power of municipal corporations, and the method by which, if at all, a franchise can arise by implication.

The public cannot be held to have parted with its fundamental rights, except by clear and explicit language, or by implication equally clear. This rule of law is thoroughly established, and must not be relaxed. It is essential to the preservation of the rights of the people, for whose benefit Legislatures and municipal councils are created, and public service corporations permitted to exist.

Let us examine into the grounds of these salutary definitions and declarations.

In the state Legislature, under the sanction given and limits set by the Constitution, is reposed the sovereign power of the state. Some of that power it has delegated to the municipal council. A fragment of its authority, which it may at any moment recall, it has turned over to the council of the city of Cleveland. Among other things, it has so turned over to the city is the power of limiting to 25 years the time during which a street railway company, under its perpetual charter to be a corporation, may operate its cars on the streets of the city. I say "perpetual charter," because, while the state could repeal or annul the charter, it does not in fact do so, except for misuser or nonuser. We have therefore the patent fact that a corporation may have perpetual life given it by the state, but may be lawfully denied by the municipal corporation the right to have anything more than a nominal life, unless in some lawful manner it succeeds to rights which the municipal corporation has granted. Now, this delegated sovereignty reposed in the municipality by the state is to be exercised by the agent with no less care than if exercised by the sovereign itself. It is true, as urged by counsel, that the city council has plenary power, subject only to certain well-defined limitations; but it is not to be therefore said that, having plenary power, that power may be exercised in any other than the method provided by law, or that it may be assumed to have exercised it when the fact does not clearly appear. The council is not merely representative of the people who elect it. It is also the representative of the sovereign. Restrictions are vain if the checks put upon the methods of municipal legislation are not to be respected when they deal with fundamental rights. The rule that obligations arise or rights are granted by mere implication depends upon the nature of the parties, and the character of the obligations and rights. It is a very easy thing for a man competent to contract to have his rights determined by the just implications from his acts. He may find himself parting possession with his property even when he did

not intend to do so.    But this is all but impossible with a municipal corporation.    Indeed, a municipal corporation, through its council or officers, may sometimes make strenuous effort to part with its property or with public rights, and fail in the effort.    Instances of this kind could be indefinitely multiplied.    But to say that a municipal corporation, the delegate of sovereignty, has parted with one of the powers of sovereignty by implication, is to assume that which, while not impossible, can only be supported by the strongest proof, and by an implication so cogent as to be quite as impressive and conclusive as if the grant had been made in express terms.

The rule of grant by implication is correctly stated in Booth on Street Railways, § 43, as follows:

"As repeals by implication are not favored, and the rule of strict construction against the grantee is strictly applied to charters of private corporations, a corporation will not be permitted to enlarge a franchise beyond the expiration of its original charter unless that intention has been clearly expressed by the granting power. Amendatory and supplemental acts or ordinances will not have that effect unless the intention to renew the franchise be expressed in apt terms, and any ambiguity in the language used will be resolved in favor of the state."

Judge Cooley, in his work on Constitutional Limitations, at page 394, quotes with approval the language of the Supreme Court of Pennsylvania in the case of Railroad Company v. Canal Commissioners, 21 Pa. 22:

"When a state means to clothe a corporate body with a portion of her own sovereignty, and to disarm herself to that extent of the power that belongs to her, it is so easy to say so that we will never believe it to be meant when it is not said. In the construction of a charter, to be in doubt is to be resolved, and every resolution which springs from doubt is against the corporation."

The Supreme Court of the United States has expressed the same thing in no less emphatic terms in Fertilizing Company v. Hyde Park, 97 U. S. 66, 24 L. Ed. 1036:

"Every reasonable doubt is to be resolved adversely to the corporation. Nothing is to be taken as conceded but what is given in unmistakable terms or by an implication equally clear. The affirmative must be shown. Silence is negation, and doubt is fatal to the claim. This doctrine is vital to the public welfare. It is axiomatic in the jurisprudence of this court."

The general doctrine is laid down by Chief Justice Taney in Charles River Bridge v. Warren Bridge, 11 Pet. 420, 9 L. Ed. 773, 938, in which the proposition is forcibly stated that, as against the sovereign, no grant can arise by implication, but that the full vigor and powers of the sovereign will be presumed to exist in every case where a claim is made in derogation of them, unless by clear, positive, and explicit language a grant has been made.

An interesting case is that of New Orleans & Carrollton Railroad Company v. City of New Orleans, 34 La. Ann. 429.    In that case a company was chartered by the Legislature of Louisiana in 1833, the duration of its franchise being 50 years.    The company was to build and operate a railroad from New Orleans to Carrollton, and all of its property was for a definite period exempted from taxation. In 1835 another act was passed by the Legislature, providing for

the enlargement and mode of subscription and payment of shares of the capital stock of the original company, conferring upon it certain banking privileges, and authorizing it to construct a continuation of the railroad authorized under the previous law, from Carrollton to the town of Bayou Sara. It was provided in express terms that this second grant, and all privileges conferred by it, were to remain in force for 75 years from the date of the passage of the act, and further provided that all of the property of the company in the nature of railroad and equipment should at the end of said period of 75 years revert to the state. Upon the basis of these two and certain other acts of the Legislature of Louisiana pertaining to said company, and affecting various of its rights, it was contended that the limitation of time contained in the second grant extended the life of the first grant, and that the exemption from taxation provided in the first grant was annulled by the second, but that all of the property covered by the first grant, with that covered by the second, reverted to the state at the end of the period of 75 years. The company was thus contending for a sacrifice of rights very important to it on the one hand, while it contended for an extension of its life 25 years on the other. The court says:

"A fact which impresses one as remarkable at the outset is that the Carrollton Railroad Company, which has initiated this litigation, should be contending with such zeal to enlarge the construction of the twenty-second section of the act of 1835, which purports to do nothing except to impose upon the company a burden, and to exact a penalty as a compensation for privileges, part of which it never exercised, none of which ever inured to its advantage, and all of which have long since been abandoned. This anomaly is explained when we see that the company deduces from this burden implied privileges in its own favor largely exceeding in value the burden itself, and thus seeks to convert the penalty into a reward."

The court says on page 440, referring to a phrase in the act of 1835 which provided that the railroad to be constructed under the second grant was to "constitute a continuation" of the road constructed under the first grant, from which the results above outlined were attempted to be deduced:

"Surely so slender a thread was never required to support so ponderous a weight. * * * They extend by implication the existence of the corporation twenty-five years beyond the term to which its duration was expressly limited by its charter."

As to implication of renewal or expansion of duration, see the case of City of Cincinnati v. Cincinnati Inclined Plane Railway Company (Superior Court of Cincinnati) 30 Wkly. Law Bul. 321, affirmed by the Supreme Court without report. Among other things held in that case was that:

"The fact that, in 1885 and 1888, at which times the grant for route No. 8 had expired, the board of public works granted to the defendant company permission to substitute electricity as a motive power in place of animals, did not impliedly renew the grant of that route."

Although in that case it was held that the board of public works had no right alone to grant a renewal, the court says that the language of the grants gives no warrant whatever to any claim that even the board of public works or the board of public affairs in-

tended to renew any grant then in existence, or to vitalize any grants whose existence was doubtful. And the court goes on to say that the expenditures made by the railway company in substituting electricity as a motive power do not operate to bring about a renewal by estoppel. And this is true, not only for the reasons already asserted, but because of the nature of the situation which exists when such legislation is under consideration. The municipal legislative body does not always consider the possible legal deductions which may be made from its language, and it could not do so. When the matter is susceptible of such easy expression in the English language, it might well suppose that if, by an ordinance, it was intended to fix a period for a franchise, it could be done in unmistakable terms. There is no need of concealment in such cases, and no need for implication.

If it be true that to grant the right to build an extension, and permit its operation as such, in connection with the system of which it forms a part, for a period beyond the duration of the system's franchise, is to extend to that date the franchise of the system, then we must conclude that the council may give away the public's property and the rights of the community, without knowing that it is doing so, and while striving not to do so.

It is most ingeniously and plausibly argued that to give the right to operate, in connection with the main stem, the extension of an existing line, to a time beyond the time allotted to the existing main stem, is, by implication, to extend the period of the right to operate the main stem, because, if it were otherwise, it would lead to an absurdity, and leave the fragmental extension alone and incapable of operation when the franchise of the main stem expired.

Yet, apart from the fundamental objection which I shall hereafter discuss, a little reflection suggests many answers to the claim. The extension may or may not be incapable of independent operation. Is the determination of the right to depend upon the particular conditions of independence or of isolation in each case? The price is too high, and the implication too severe and far-reaching; if, as claimed by counsel, a slight prolongation of a line, made under the statute allowing extensions, shall suffice to extend the franchise of 236 miles of line, if, perchance, a careless or generous or complaisant council, dealing with the triviality of a few hundred feet of extension, should give the right to operate it, in connection with the main line, for a period beyond the date of expiration of the main line's franchise. Certainly no obligation is incurred to so operate in connection with the main line after the company's franchise to the main line has expired. No doubt the vigilant representatives of the railway company will always endeavor to procure the longest possible term for the most trivial extension. The council may think the right of such slight importance as to grant it without thought of any additional and important rights arising by implication. When the right is possessed, if it can be possessed, and the corporation is in possession even of only a few hundred yards under such a franchise, it has a position of some importance, and sometimes of controlling importance.

An examination and comparison of the several ordinances relating to this subject leaves upon the mind the indelible conclusion that after the ordinance of March 22, 1880, all of the extensions of the Garden street line were intended to expire with the Garden street main line franchise, viz., March 22, 1905. I am of opinion that it was the purpose of the council all the time to make the life of the right to operate the Garden street line all the same throughout its length, and over all the extensions and additional tracks. This view is supported by the inherent reasonableness of the purpose and by the language of most of the extension ordinances. It is to some extent discredited by the language of the ordinance dated April 20, 1891, in which it is provided that the right to operate the extension therein referred to shall terminate with "the expiration of the grants for said company's tracks on said Quincy street east of Lincoln avenue, to wit, July 13, 1913." But if this shows that the council assumed and believed that the franchise east of Lincoln avenue did not terminate with the termination of the main Garden street ordinance, it shows, also, beyond the possibility of successful answer, that the right to operate the Garden street main line did not automatically expand and lengthen every time an extension ordinance was passed, with an extended date of expiration.

But after all, the conclusively satisfactory answer is that it is intolerable to think that instead of using direct, explicit, and easily framed language to grant a great right which only the sovereign can grant, it may be conveyed by an implication to be raised by a process of reasoning which the lay mind has difficulty in comprehending, and which it could hardly discern at all if not pointed out, and that this implication may be so derived from apparently innocuous and insignificant words lost in the mazes of an ordinance of relatively small consequence. Fundamental powers of the sovereign to be used by a delegated body, naturally untrained in the law's learning, and rigidly restricted in its use, are not to be so exercised.

Nor are we denied the possession of other cogent reasons reaching the same conclusion. In view of the contention here made by the complainant, it is most significant and astonishing that in no single instance of an extension ordinance does the title of the ordinance state that any such object was in view, or that any extension of time for expiration of either the main line or the Garden street branch was involved in the permission thereby given for the construction of an extension. But the law explicitly requires that the "subject" of an ordinance "shall be clearly expressed in its title." What could more surely do violence to the letter and spirit and purpose of that legal requirement than to say that an ordinance entitled an ordinance to permit some petty and relatively unimportant extension should be found to contain within its sophistical implications a grant renewing for a term of years an important and far-reaching franchise? Can such an implication from such an ordinance, so entitled, be justified either on the ground of reason or of propriety?

Respecting the ordinance of April 20, 1891, granting to the East Cleveland Railroad Company permission to lay an additional or second track in Quincy street from New street to Woodland Hills avenue, and wherein it is provided that the right therein granted shall be "valid until the expiration of the grant for said company's tracks in Quincy street east of Lincoln avenue, to wit, July 13, 1913," and the claim that this establishes complainant's contention, the conclusive answer is that the grant for the company's tracks in Quincy street east of Lincoln avenue did not and would not expire July 13, 1913. The ordinance did not state the fact. It is true that the original right in Quincy street east of Lincoln avenue was, by the terms of the ordinance granting it, to expire with the main line franchise. If by "main line" was meant the Euclid avenue line, then it would expire in 1904. Subsequently that main line franchise was extended to July 13, 1913, and doubtless the person who drafted this ordinance assumed that as the main line franchise had been extended to July, 1913, the effect of that extension was to extend the time of the rights in Quincy street east of Lincoln avenue to that date. But the fatal defect in that process of reasoning, and the fatal objection to the date inserted in the ordinance of April 20, 1891, is that after the passage of the ordinance for the Quincy street extension east of Lincoln avenue, and before the passage of the ordinance extending the main line to 1913, to wit, on March 10, 1890, the council passed an ordinance authorizing the East Cleveland Railroad Company to substitute electrical motive power for horse power over its Garden street line to Woodland Hills avenue, and provided that the right to operate the Garden street branch should continue during the term of the company's then present grant for the operation of the tracks upon the Garden street branch. Now, the Garden Street franchise, at the time of the passage of the ordinance of March 10, 1890, was to expire on the 22d day of March, 1905, and the period of expiration of the right to operate an extension east of Lincoln avenue on Quincy street, if it could be different from the life of the main stem, if it could be made to coexist with the franchise on the Euclid avenue line, was wholly wiped out by this new ordinance authorizing the use of electricity, and changed the termination of its franchise to accord with the franchise for the Garden street line, viz., March 22, 1905. It therefore follows, from the language of the several ordinances, properly interpreted, that the franchise for the entire Garden street line expired March 22, 1905.

(2) While the foregoing considerations lead to the conclusion that the relief sought by the complainant must be denied, still I am constrained to rest my determination of this question on a much broader and more satisfactory ground. I have reached the conviction that it is beyond the power of the council to endow an "extension" with a duration of life extending beyond the life of the line which is extended. This, it seems to me, must be true, considering the nature of an extension, as well as the statutory provisions relating thereto. Before we can arrive at a definition of an exten-

sion, as the term is used in Ohio, it is necessary to examine the statutory provisions which throw light upon the subject.

Under the law of Ohio, three different things may occur respecting the construction and operation of a street car line: First, the establishment of a route, which must be done in a certain formal way, in which there is an opportunity for competitive bidding; second, the renewal of a franchise, but neither the grant of the right to construct a railroad, nor the renewal of that grant, is valid for more than 25 years; and the third thing that may be acquired is the right to extend the track of a street railroad. The Garden street line, which, with its extensions, is the subject of this controversy, as originally established, was not an extension of the East Cleveland Railroad Company's line, but was a branch, possessing all of the characteristics of an original route, and was established in strict conformity with the requirements of sections 2501, 2502, Rev. St. The fact is that, when authority was given to construct the Garden street branch, no authority existed for the extension of the track of a street railroad, and it was necessary, in order to obtain the right, to proceed under the authority of what are now sections 2501 and 2502. Section 2501 provides as follows:

"Sec. 2501. No corporation, individual or individuals shall perform any work in the construction of a street railroad, until application for leave is made to the council in writing, and the counsel by ordinance shall have granted permission, and prescribed the terms and conditions upon, and the manner in which the road shall be constructed and operated, and the streets and alleys which shall be used and occupied therefor, but the council may renew any such grant at its expiration upon such conditions as may be considered to the public interest."

Section 2502 provides as follows:

"Nothing mentioned in section 2501 of the Revised Statutes of Ohio shall be done; no ordinance or resolution to establish or define a street railroad route shall be passed, and no action inviting proposals to construct and operate such railroad shall be taken by the council; and no ordinance for the purpose specified in section 2501 of the Revised Statutes of Ohio shall be passed until public notice of the application therefor has been given by the clerk of the corporation once a week, for the period of at least three consecutive weeks in one or more of the daily papers, if there be such, and if not, then in one or more weekly papers published in the corporation; and no such grant as mentioned in section 2501 of the Revised Statutes of Ohio shall be made, except to the corporation, individual or individuals, that will agree to carry passengers upon such proposed railroad at the lowest rates of fare, and shall have previously obtained the written consent of a majority of the property holders upon each street or part thereof, on the line of the proposed street railroad, represented by the feet front of the property abutting on the several streets along which such road is proposed to be constructed: provided, that no grant nor renewal of any grant for the construction or operation of any street railroad, shall be valid for a greater period then twenty-five years from the date of such grant or renewal; and after such grant or renewal of a grant is made, whether by special or general ordinance, the municipal corporation shall not, during the term of such grant or renewal, release the grantee from any obligation or liability imposed by the terms of such grant or renewal of grant."

Neither section 2501 nor section 2502 refers to or has anything to do with extensions, and it follows that, if an extension has any

different life from that with which the thing extended is endowed, it is because the state has not limited the power of the municipal council in respect to the right to limit the life of such extension.  The state has delegated this authority to limit the life of an original franchise or a renewal to 25 years, and does not, in terms, put any limitation on the life of any other grant relating to street railroads.  If an extension may have any other life than the life of the thing to which it forms an extension, it may be given an unlimited term of life by the council.  The general law gives authority to the council to consent to the use of the city's streets by street railroads, and, as we have seen, it was not until 1878 that a proviso was added to the effect that no grant or renewal (that is to say, no grant or renewal under sections 2501 and 2502) should be valid for more than 25 years.  This proviso is a limitation upon the plenary power theretofore given by the state to the council, and no more is to be subtracted, in consequence of that proviso, from that plenary power thus delegated, than its express terms permit.  There is no specific limitation, nor can such be derived by implication, upon the power of the council to give as large a consent for as full a time to an extension as prior to 1878 it could give to an original grant or renewal, unless the position is sound that an extension, in the very nature of things being a part of the thing extended, must have the same life as, and no more than, the line or branch or route of which it is an extension.  The grants and renewals referred to in the last clause of section 2502 must mean the original grant or its renewal, and cannot apply to an extension, because the first requirement of section 2502 is that nothing mentioned in section 2501—that is to say, no work performed in the construction of a street railroad—shall be done until suitable advertisement has been made, and the right given to the corporation or individuals that will carry passengers at the lowest rate of fare.

Section 2505, which, so far as this question is concerned, is in the same form now as it always has been, provides as follows:

"Sec. 2505. The council of any city or village may grant permission, by ordinance, to any corporation, individual, or company owning, or having the right to construct, any street railroad, to extend their track, subject to the provisions of sections 3437, 3438, 3439, 3440, 3441, 3442 and 3443, on any street or streets where council may deem such extension beneficial to the public; and when any such extension is made, the charge for carrying passengers on any street railroad so extended, and its connections made with any other road or roads, by consolidation under existing laws, shall not be increased by reason of such extension or consolidation."

This section, it will be noticed, authorizes the extension of a "track," and implies a mere physical act made necessary or useful by reason of the existence of certain conditions.

In its original form, this section was passed May 7, 1869 (66 Ohio Laws, p. 140), and was supplementary to an act passed March 27, 1866 (63 Ohio Laws, p. 55); and the provisions to which it was then subject were provisions of the act of March 27, 1866,

determining how the street railroad company might proceed when it was unable to obtain the consent of a majority of the property owners along the street, and gave them the right of appropriation. It will be noted that this right of extension is granted under certain conditions named in the section, and also subject to the provisions of sections 3437 to 3443, inclusive. These sections fix the terms and conditions upon which the extension may be made, and are not, therefore, the terms and conditions described in section 2501, relating to the establishment of a route or the renewal of a grant. An extension of the track of a street railroad may be permitted to the corporation owning the line sought to be extended, without any competitive bidding, on such terms and conditions as the council and the company may agree, and, of course, subject to the consent of a majority, by feet front, of the property owners along the line of the extension. The right of extension is, as it must be, based upon the fact that there is already a line in existence, and that the permission to extend is a mere development of the right already granted. It extends the track only. The language of section 3439 is significant in this respect, namely, that:

"The provisions of sections 2501 and of 2503 to 2505, inclusive, so far as they are applicable, shall be observed in all respects, whether the railway proposed is an extension of an old, or the granting of a new, route."

Now, the extension of an old route is not the granting of a new route, as the juxtaposition of the terms contained in section 3439 manifestly discloses. The extension of an old route, as the term is used in section 3439, means, if we can understand the ordinary meaning of language, that it is a mere physical addition to the route or right already established, and that it becomes incorporated in, and actually a physical and legal part of, that which was originally established. Otherwise we would have the spectacle of a new route or new line established without the usual formality of a petition, with an opportunity to all persons to bid for the same. If this reasoning is sound, it is quite apparent that an extension of an existing route can have no other term of life than the term of life of the line to which it is an extension. If it were not so, we would not only be confronted with the condition where two parts of one line have a different duration of life, but we would have a vested right in the corporation which owned the route to occupy a part of it far beyond the period of life of the original stem, and practically nullify the statutory requirement when new routes are established. But more than that would be true. Under the law of Ohio, an extension may be granted for an unlimited term, or it must have its life determined by the life of the thing extended. Nowhere can authority be found for limiting the life of an extension, if an extension is considered as a thing to which the council can give any period of time it pleases up to 25 years. Strictly speaking, the granting by the council of the right to extend a street railway line is not the giving of a franchise, but the expansion or

enlargement of a franchise already given. It is, at most, nothing more than a subsidiary franchise. It is not original. It can have no life and no power which do not inhere in and belong to the original line of which it is an extension. As stated in the text of Booth on Street Railways, § 63, "The extension is a necessary incident to the principal subject of a previous valid grant." Now, if an extension is a necessary incident to the principal subject of a previous valid grant, how can anything more occur, than that the extension is absorbed by the previous valid grant, and has precisely the same life which that grant possesses? The same principle, of necessity, applies to, and indeed is most aptly illustrated by, the ordinances granting the right to lay an additional track over a part of an established route or its extension. How can the period during which the right exists to operate the additional track extend beyond the life of the line to which the track is added? The second track is neither an extension nor a renewal. It is not the establishment of an original route. It is not governed by the requirements of section 2502. There is no competitive bidding. It is a mere incident of the contract between the city and the street railroad company. It is, like the extension, a mere integral part, but only a part, of the main body of the property. The life of the right to operate it must, in the very nature of things, terminate with the life of the main body of which it is a part. The effort of the council to give it life beyond the life of the main stem is not effective, either to give the right to operate the additional track beyond the period fixed by the ordinances for the main stem franchise, or, by reason of the grant of the additional track, to extend the life of the line of which it forms a part. The council had no power, having established a route under certain conditions which the law requires, and having the right to renew it as a renewal, to undertake, by the mere giving of the right to double-track, to give the right to operate the second track for a period beyond the term of the franchise of the line which is double-tracked. One might as well say that the human foot could survive after the vital organs had ceased to exist; that, where there is one life-giving center, the things which grow out of it and are subsidiary to it may live after the life-giving center has ceased to have life; that the tree, having sent forth a branch, might die, but leave the life of the branch unaffected. The whole theory of the claim that an extension can live longer than the thing extended is at war with reason and with the nature of things. It is true that in this respect the extension statute has not been considered by the courts. The word "extension" has not been defined. It has not been judicially declared that an extension cannot live longer than the thing extended. Probably this is so because no contrary contention has ever before been made. The only reference which has come to the attention of the court, at all touching the subject, appears in the opinion in the case of Cincinnati v. Cincinnati Street Railway Company (in the Superior Court of Cincinnati) 31 Wkly. Law Bul. 308. In this case the court says, after holding that it was competent for

the council to impose terms and conditions upon which an extension could be made:

"Among the conditions which I have excepted from the application of this principle [that is, among the conditions which may not be changed by councilmanic action, or imposed upon a company at the time of making an extension] are those which provide that no increased rate of fare shall be charged beyond that authorized to be charged on said route No. 13, and that the term of the extension shall terminate with the term of the original grant. These are really not conditions imposed by the board of administration, but by the law itself, and may therefore be dismissed from the discussion."

The opinion in this case very elaborately discusses the subject of extensions. If the claim had been made or if the thought had occurred that an extension might have a life enduring beyond that of the line extended, it would undoubtedly have been raised in this case, and would have been discussed by the court; but the court, in view of the subject, which had evidently been elaborately argued and fully considered, makes the remark, in passing, which evidences a conviction on its part, that the law itself imposes the condition that the term of the extension shall terminate with the term of the original grant.

These conclusions may be summarized as follows:

(1) Prior to the act of May 14, 1878, it was competent for the council to make grants for street railway purposes, either with or without limitation as to time.

(2) Whatever be the duration of a grant, whether limited or unlimited, it may be changed by contract between the city and the grantee of the right, subject only to the proviso now in force—that no grant shall be valid for more than 25 years.

(3) Neither the consolidation of the street railway lines into one company and one system, nor the transfer obligations imposed by the Willson avenue ordinance, operates to prolong the life of any prior grant.

(4) An extension of the life of a grant by implication is not favored, and will not be declared, except when clearly manifest and obviously necessary; and this rule is invoked with especial propriety where the implication is sought to be made in ordinances, not one of which, in its title, gives the slightest intimation of a purpose to deal with the subject of the life of a grant.

(5) Permission to extend tracks and operate them "in connection with the main line" for a period which endures longer than the right to operate the main line will not have the effect of extending the life of the main line grant.

(6) The ordinance of March 10, 1890, authorizing the substitution of electricity for horse power on the Garden street (Central avenue) branch, fixed a uniform period for the termination of the franchise of the Garden street line over its entire length to Woodland Hills avenue, and abrogated, by consent of both parties, any prior contract for a different date, if any such there was.

(7) An "extension" is not a new route; it has no independent life; it depends upon and is a part of the line to which it is added; and, as it could have had no legal existence without the original

line, so it can have no tenure of life beyond that of the original line.

(8) The Garden street branch was established as a "route," and is an original line. The franchise to operate it, including all of its extensions and additional tracks expired March 22, 1905.

The temporary injunction asked for will therefore be denied. A decree may be taken in accordance with this opinion, and it ought to be framed as if upon final hearing.

---

### THE SUE.

#### (District Court, E. D. North Carolina. March 29, 1905.)

1. JUDICIAL SALE—GROUNDS FOR SETTING ASIDE—OFFER OF INCREASED BID.

    A sale of a libeled vessel in admiralty, made by consent, but which has not been finally confirmed, will be set aside, and a new sale ordered, on an offer of a materially increased bid; and it is no ground of objection to such action that the first bidder has deposited the amount of his bid, or incurred expense on account of his supposed purchase, since he could acquire no rights or standing in the case until confirmation.

2. MARITIME LIENS—REPAIRS AND SUPPLIES FURNISHED IN HOME PORT.

    There is no lien for repairs or supplies furnished to a vessel in her home port on the order of the owners, unless given by the local law; and in such case the provisions of such law must be followed, or no lien is acquired.

    [Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Maritime Liens, §§ 7-9.]

    Maritime liens for supplies and services, presumption as to credit to vessel, see note to The George Dumois, 15 C. C. A. 679.]

In Admiralty.

W. W. Clark, for libelants Williams & Cosby.
S. M. Brinson and W. D. McIver, for M. B. Smith.