**ALFORD et al. v. ILLINOIS CENT. R. CO.**

**Civ. A. No. 2271.**

United States District Court
W. D. Louisiana, Shreveport Division.

Sept. 24, 1949.

Morgan, Baker & Skeels, Booth, Lockard & Jack, all of Shreveport, La., for plaintiffs.

Thompson, Thompson & Sparks, of Monroe, La., Freyer, Goode, Nelson & Freyer, of Shreveport, La., for defendant.

PORTERIE, District Judge.

Plaintiffs, over 150 in number, complain that defendant is maintaining a nuisance at its coaling station or so-called roundhouse in Bossier City, Louisiana, with resultant damage to their respective properties and "inconvenience, discomfort and annoyance to them personally."

The complaint charges that defendant, in refueling or firing its locomotives at Bossier City, negligently creates and sends into the atmosphere dense and obnoxious smoke, with accompanying gases, soot, and cinders, which settles on and infiltrates plaintiffs' homes, damages the paint, screens and wallpaper of their homes, and subjects them to personal discomfort.

There is no allegation that defendant's roundhouse facilities were improperly or negligently located in that they were placed in such close proximity to the homes in this popular residential area as to constitute by reason of such location or placement a nuisance. At least two-thirds of the houses in this area of Bossier City have been built since the defendant moved the roundhouse facilities of its predecessor, in 1933, from Cotton and McNeil Streets in the City of

Shreveport to a ten-acre tract it owned in Bossier City. The ten-acre tract was not then nor is it now located in close proximity to residences since it is separated by a wide public highway from the homes in this area.

The defendant was not compelled to move these facilities from Shreveport to the ten-acre tract because defendant continually polluted the air with coal smoke; nor were the facilities moved as a result of the holding in Tucker v. Vicksburg, S. & P. R. Co., 1910, 125 La. 689, 51 So. 689; but they were moved only because the Shreveport facilities were inadequate (a larger area was needed for the mechanical operations of the company), and in order to do away with uneconomical arrangements under which locomotives were moved from Shreveport, where there was no turntable, to the turntable at Bossier City, there turned, and then moved back to Shreveport.

This complaint of nuisance against defendant and its predecessors is of long standing and of repeated assertion in the courts. It was first given judicial review in the case of Tucker v. Vicksburg, S. & P. R. Co., 1910, 125 La. 689, 51 So. 689. The railroad company then moved its roundhouse, because of crowded conditions, from the City of Shreveport proper, across the Red River, to Bossier City—locating on the outskirts of the then existing Bossier City.

The next assertion—and it is one of immediate relation to the instant case because the same situs is involved—was in the case of McGee v. Yazoo & M. V. R. Co., 1944, 206 La. 121, 19 So.2d 21. Then, the next and last assertion was in the case of Devoke v. Yazoo & M. V. R. Co., 1947, 211 La. 729, 30 So.2d 816. Finally, we have the instant case filed on September 6, 1947, in the state court, but removed to this court by the defendant because of diversity of citizenship and of the amount in controversy.

■ The Louisiana law, as given by our state supreme court in the above cases, is the law applicable. Whether or not the defendant is neglectful is not the deciding point; the real issue is whether or not the plaintiffs suffer unreasonably from the nuisance. The nuisance, of course, must be caused by the defendant; "and what the defendant does, however conscientiously done and however much it costs, is irrelevant". Plaintiff's brief. However, in the case that the source, or sources, of a nuisance be in doubt, or at issue, the want of negligence of a defendant is admissible circumstantial evidence in a defendant's favor.

■ As a matter of law, we do not admit that, because the state court in the Devoke case found that defendant's facilities, as they were operated in 1945, constituted a nuisance, this court must likewise find that the operation of these facilities constituted a nuisance in 1948 or 1949. Since the parties are not the same, the witnesses are not the same, the period of time in which it is claimed a nuisance existed is not the same and the factual situation is not the same, and, particularly, since improved devices have been added for the suppression of smoke by the railroad company, since the Devoke case, and additionally, because there has been much more diligence and cooperation by all the laborers, the foremen, and executives of the defendant company, we are free in our interpretation of the facts in the instant case. We are not bound to consider the thing as being adjudged. La. Civil Code, Art. 2286.

■ Our decision in this case is that from December 1, 1948, on, there is actually no nuisance of any kind. We arrive at that conclusion from the facts. We are not arriving at this conclusion because the improvements by the defendant are well-nigh perfect; improvements will not insulate against liability, if the plaintiffs suffer in spite of them. Snow v. Marion Realty Co., 212 Cal. 622, 299 P. 720.

Our decision is not influenced by the fact that quite a number of plaintiffs became owners of the property after the alleged nuisance existed for a number of years, or that, even knowing it was so affected, they still persisted in buying property in the area. McGee v. Yazoo & M. V. R. Co., 1944, 206 La. 121, 19 So.2d 21; Tucker v. Vicksburg, S. & P. R. Co., 1910, 125 La. 689, 51 So. 689.

■ The right of habitation is superior to the right of industry or trade. American Smelting & Refining Co. v. Godfrey, 8 Cir., 1907, 158 F. 225, 14 Ann.Cas. 8. "If

population, where there was none before, approaches a nuisance, it is the duty of those liable at once to put an end to it. Brady v. Weeks, 3 Barb., N.Y., 157." Northwestern Fertilizing Co. v. Hyde Park, 1878, 97 U.S. 659, 24 L.Ed. 1036.

The defendant's claim that the plaintiffs are barred by the prescription of one year is overruled. See Devoke v. Yazoo & M. V. R. Co., 211 La. 729, 30 So. 2d 816, 822, and cases cited there.

We appreciate the minor weakness of this ruling: The nuisance is not distinctly "a continuous one of daily occurrence" (Devoke case, supra) because the full discomfort and inconvenience occurred only on the day or days that the wind blew over the area affected from the direction of defendant's plant—roundhouse and switching facilities. Because the plaintiff did suffer from the presence of soot and cinders in between the times that the winds would blow from the direction of the nuisance, we are impelled to overlook this noted weakness.

In this case the court must charge itself, among other things, that, as a jury

would, it must determine whether or not the credibility of the witnesses employed by the defendant, laborers or executives, is influenced by the fact of their employment. We must say no threat of dismissal hangs over the heads of the laborers for, being unionized, they are free. We have discerned, however, quite an attachment in all those employed for the defendant company. This might affect their testimony.

The court must charge itself too, that the plaintiffs have a great monetary interest in the result of this case; whether or not they are moved by that consideration is an important point.

The proof of the physical discomfort necessary under the law to support the allegation of nuisance under which would flow damages under our law is, in our opinion, missing in the instant case during the recent year; it would only exist—and then to a modified degree—from the dates of the various claims in this law suit to December 1, 1948, which date has been determined by us hereinbelow, with reasons.[1]

---

1. Selections from the evidence of Mrs. C. M. Brown, one of the leading and most favorable witnesses among the number of plaintiffs, in support of the claim at issue:

As to the time she did suffer, all before December 1, 1948: "A. This curtain was hung the 25th of August, and I left it there one week.

"Q. Of what year? A. 1948."

Again she says: "A. I washed this curtain August 3, 1948, and I took it down September 3, 1948."

"Q. What date was it that you fixed that up? A. August 22nd. That is the date there."

Here is another: "A. This is dated October 7, 1947 * * *".

To show that she used spots where the greatest quantity of matter would ordinarily and generally be located: " * * * this was wiped from the top of the frame of the pictures in my living room."

To show exaggeration: "Q. It had been three weeks since you had cleaned the shelf in your breakfast room? A. Yes, sir, I left it three weeks to see what I would get."

Again:

"Q. How long before that had you rubbed it off before? A. I hadn't rubbed it off in a good while."

Again as to exaggeration: "Q. How long had it been since you had washed it before? A. I don't think I had washed that window before that in about a month."

To give the general character to her as a witness, in that her interest was the greatest, causing the others who suffered in a less degree to claim as much as she did, we have the following under cross-examination:

"Q. You have been very active in getting together a vast number of plaintiffs to appear in this suit too, have you not? A. Well, in a way.

"Q. You have been, if I may use the expression, the so-called ring leader of those who have been active in this proceeding? A. Maybe so, because I live right there under it. It bothers me more than it does anybody else.

"Q. And you have solicited a great number of these plaintiffs to file this suit? A. I just asked them if the soot and smut and cinders bothered them and if they wanted to get rid of it.

After you have heard this case as a whole, you are left with several very forceful impressions. One of these is that the plaintiffs have a very similar complaint in language and in detail. There are a number of other residents in the same area, equally as credible, who come to court and say they do not suffer from any nuisance whatsoever. There are many, perhaps half of the residents of this area, who do not file suit; nor do they testify in this case. They remain, apparently, absolutely silent and uncomplaining. So, presumably, the nuisance, if any, is not and cannot be very serious and general.

The courtroom evidence made us expect much more damage and nuisance than we could find upon our visits to the area during the trial. The residential area is very clean in every particular; no person driving through would ever suspect an existing nuisance-cancer as was described in the courtroom. We visited the area several times since the close of the case and the fine, clean appearance was the same. There was never any smoke, soot, or cinders on any one of our visits.

On all these visits we stopped close to the roundhouse—once went to it—and never did we find an engine smokestack not under a water scrubber; never did we see any black smoke—only white, steam-like smoke that at once vanished in the air. This was much like in the moving pictures exhibited during the trial in court.

Once in a while in the run of the testimony of the many plaintiffs, there would appear the fact that conditions were improving; that the discomfort from the smoke, soot and cinders had lessened of late. We have definitely concluded that the extremely zealous and very sincere coordinated efforts of the employees and executives of the defendant have brought fruit.

The degree of nuisance had passed definitely away from the quality that would make it under the law of actionable character.

Whether the employed were in working jeans or with white collars they showed a coordinated desire and a commendable zeal in sparing no effort in suppressing the alleged nuisance. They did succeed and it is our injunction that they continue assiduously in their sincere present and effective effort.

All of us live in houses; we know that there is always dirt. As we looked at the cloths, curtains and draperies furnished in evidence by the numerous plaintiffs, all stained generally with brown and sometimes with black matter, we wondered how much of it was from the railroad's engines and how much was from the natural gas burned openly in the very room, how much from the dust of the street's shoulders, how much (the slightly oozy, sticky stuff) from the oil-covered gravel of some of the streets, etc. When we declare that the plaintiffs are due at all, we feel, in good conscience, that we have gone the limit in their favor.

Again, as to the dirt in the interior of the houses: It comes from the dust from the shoulders of the streets (these are so much nearer the houses than the roundhouse); it certainly comes from the fresh oil which is placed on the gravel of the streets and left to soak (and this accounts for the oily ooze of the dirt exhibited in court). Everyone must admit that open natural gas heaters tinge in time with brown the white draperies of any room. Some of the dirt may be, and likely is, from the smoke and soot (not cinders) of the roundhouse engines and from the switching engines. Is it at all from the railroad premises to an actionable degree, however? We are not quite sure. We are positive that from

"Q. Answer my question, Mrs. Brown; you have solicited a greater number of these plaintiffs to join with you in bringing this suit? A. Well, yes.

"Q. You have had frequent meetings and consultations with your co-plaintiffs as to how this case should be presented to the Court? A. Well, in a way, yes.

"Q. This was also true of the McGee and Devoke cases? A. Well, I guess so."

Mrs. Brown was in constant attendance at the trial lasting three weeks; if she missed a half-day or a day, it was all.

December 1, 1948, to now the alleged nuisance is practically non-existent.

The facts show that the executives of the railroad gave the suppression of the smoke nuisance their zealous and assiduous attention. In consequence, the evidence shows that the employees, also, quite properly responded diligently to this appeal and urge from the executives of the railroad company. Firemen and engineers, special nuisance attendants, etc., saw to it dutifully and regularly that no freshening of the engine fires were attempted or done except that the hoods of the water scrubbers were well applied to the smokestacks. Also new appliances were placed on all of the defendant's engines such as would reduce, if not practically do away with, smoke at the time of stoking.

Another reason which causes us to say that there was no more actionable nuisance by December 1, 1948, is that Mr. Vaughn Mansfield, an accepted expert, testified as follows:

"Q. I say, during the war the coal you sold to the railroads was not as clean as it is now? A. Certainly, there is some difference in the quality of the preparation during the war and now. The country, and especially the government, was fighting for every pound of coal that we would get out on top of the earth, and the railroads using coal were consuming more of it, because they were using considerably more equipment, and running considerably more trains, so it wasn't possible to wash and clean the coal during the war as nicely as it was before the war, and has been since the war.

"Q. So that now you are removing those impurities in greater degree? A. That is correct, to as much degree as we can remove them they have been removed from the prepared coal."

Again, Mr. Vaughn Mansfield, fully qualified as an expert on air pollution and the effect of coal used for steam locomotion on air pollution, says: "The amount of smoke produced in burning coal has nothing to do with the amount of impurities in the coal, and, illustrating that, for example, taking oil—oil has very little residual impurities—in fact you have nothing left when you burn it, yet oil improperly burned can be called one of the greatest smoke producers we have today. As with oil, improper combustion, and inefficiency in handling, the coal, produces more smoke. It has nothing to do with the question of impurities."

On the present excellence of operation by the defendant railroad company (the conclusions of the experts for defendant have all been reached before December 1, 1948), Mr. F. W. Ingram, an accepted expert and being assistant director of the bureau of smoke regulation and boiler inspector for the city of Chattanooga, testified as follows:

"Q. What have you to say as to the efficiency of these appliances? A. Well, I will say this: I was so well pleased with what I saw here that if I could get the railroads in my city to cooperate and go one-half as far as the Illinois Central has done I wouldn't have any problems in Chattanooga.

"I will go further and say that the engines, while being banked, or the fires are being cleaned, that is our major source of trouble, but I found over there there was no trouble at all.

"Q. Why wasn't it any problem? A. The method they use in cleaning fires is, in my opinion, the best I have ever seen evolved. They have the scrubbers on during most of the operation that they carry on over here, and my observation was that during that time there is absolutely no cinders or soot. That is one of the problems we have, in the operation of cleaning the fires without these heads on them, I can feel these cinders and soot, or whatever it is, in the air when they are doing it. I noticed this condition, and I asked what was causing it, and they told me, and showed me how the scrubbers worked. After seeing that, I did not find the deposits of what I am used to seeing around the place, and around railroad yards in the cleaning of fires, and they showed me the over-fire air fork, and the results of these entire operations, the scrubbers and air fork, is such that there is definitely no smoke.

"Q. During these cleaning processes, or the cleaning of the firebox, did you see any

engines over there out from under this bell-shaped affair? A. No, sir.

"Q. Did you see all of the engines under this bell-shaped affair? A. Yes.

"Q. You refer to that scrubber? A. Yes, and I would like to comment on the coal handling, because we have trouble with handling the dry coal. In filling the tinder with dry coal the small particles of dust from the coal itself will arise and blow some distance.

"Q. You mean just from the coal? A. Yes, and over there they wet the coal before it is dropped into the tinder, thus eliminating the flying dust. In that manner they eliminate one of the principal troubles that we have. I though that was very much worthwhile.

"Q. Now, from your observation did it appear to you that the personnel had been trained to use these facilities efficiently, and that during your periods of observation they were using those facilities, and in the way that they were constructed or designed to be used? A. Yes, sir, from my observation they seem to be very efficient in the handling of each of the facilities, and they seem to be using them and using them efficiently each time I was over there.

"At times when I went over there I went with officials of the railroad, and at other times I was not accompanied by any of the officials of the railroad. I have been over there when none of the officials or representatives of the railroad were along, and the personnel in the roundhouse did not know that I was coming.

"Q. Did you see any difference between the occasions, that is with respect to the manner or method of operating these facilities by the employees there, between the occasions when you were accompanied by railroad representatives, and when you were not, or when they did not know you were coming? A. I did not. The work seemed to be carried on the same manner on all occasions.

"Q. On the basis of your experience, what have you to say as to how these facilities over there compare with facilities of other railroad companies with respect to the suppression or elimination of smoke? A. For the reduction of smoke I would say that the methods used there are the best I have seen. I have not seen any yet that I considered as good as those, or as effective as those.

"I might state also that on no occasion when I was there did I ever see any smoke that I would consider to be a violation of our Smoke Ordinance.

"Q. On any of these visits did you see any smoke that could be classified or appraised as dense smoke? A. Not dense smoke, no, sir. Checking by the Linkerman Chart it was all in Class No. 2, or less. I have never seen any over there that was over No. 2."

We come to one of the conclusions out of the two [2] in which we differ from the conclusions declared by our state supreme court. One of these is as to the necessity of an enclosed roundhouse with a central smokestack. The state supreme court said as to that the following [211 La. 729, 30 So.2d 821]: "As conditions exist now, the substances emitted by the defendant's operations are shifted unimpeded in condensed volumes by the winds toward the homes of the plaintiffs who live in the immediate vicinity. It stands to reason that a roundhouse equipped with a smoke eliminator attached to a tall central smokestack would tend to diffuse and spread those substances not eliminated more evenly over a much larger area with the result that a smaller portion would reach the several properties in the area."

On this point we had rather join the official report of Mr. T. W. Langford, Chief Smoke Abatement Inspector for the City of Birmingham, Alabama, and appointed by the state court, Judge McInnis presiding, filed in both the McGee and Devoke cases, reading as follows:

2. The other different conclusion is that we declare now that the alleged nuisance ceased at a certain time; then we graduate the damages during the period allowed for; the state supreme court allows damages in full and without cessation at any date.

"I do not believe it would reduce the emission of smoke, flyash or gas to build an enclosed roundhouse with a central smoke-stack.

"The steps taken by Y & M V Railroad are more effective than any benefit might be claimed for such an improvement. In fact, the steps already taken are in advance of those adopted by the industry generally."

Moreover, since we come to the conclusion in the instant case that there is no nuisance at all of any actionable character now in existence, it follows logically that an enclosed roundhouse with a central smoke-stack is not necessary.

The two major operating devices that the defendant has installed are the water scrubbers, or bells, that are placed over the smokestack of the engines when worked on at the roundhouse. And the other is the airfork that is used in the firing of the coal in the engine. The recent improvement in the water pressure that has been used in the water scrubbers is very important.

There are no cinders at all coming from the roundhouse; they are made impossible by the scrubbers; they cannot get through the running water; no black smoke comes out either—only the white.

Additionally, there has been a more diligent and effective use of these improved facilities since the Devoke case, supra. There has been a marked improvement in the use of the overfire steam air jets, which tends "to hurry up and increase materially the handling of equipment by the employees". Langford, supra. Less time in stoking means less time for the emanation of smoke.

We now come to a consideration of the evidence of the experts furnished by both sides in this case on the various items for decision on which expert evidence is not only proper and admissible but of great help to the court. The evidence of the expert witnesses for the defendant on the (a) consumption and sulphur content of coal (b) on whether or not the operations of de-fendant were the source of sulphur dioxide and finally as to the type of atmospheric pollution existing, are far the more satisfying and convincing. We conclude from them that there never was and there is no damage now to the paint on the houses of this area. There might be a slight darkening under the eaves; there is no damage substantially to the paint as a covering for the wood. The paint in the area has been good for a period of five years at least. The general custom is that a house located anywhere should be painted about every five years.

Now as to the screens which, up to December 1, 1948, would likely become rusty in spots and with enough years would rust all over, we are of opinion in line with the evidence of Dr. A. R. Chopin that the "present trouble or damage caused inside the home" (referring as he did to screens, draperies and wallpaper) has been from "gas water vapor". This "is one of the products of combustion of natural gas in the home", he says. This witness says that the "rusting of screen wire is taking place in homes far removed from any objectionable smoke condition", and that there will be "rusting of screens all over Louisiana" as long as we have water; that the "rate of attack on screens by sulphur dioxide is a very slow process".

What we have said above as to the screens is likewise to be said of the draperies and wallpaper.

By mutual consent, furniture was not claimed to be damaged at all.

From what the experts have given us in this case as to the consumption and sulphur content of coal, considering all of the items of fact involved, we come to the conclusion that as of December 1, 1948, which is the date subsequent to the tests conducted by defendant company's experts, no contribution is being made in the consumption of coal by the defendant company that could conceivably be a nuisance.[3]

As to repair to screens, it is normally necessary in the area every two or three years; as to the total replacement of

3. The findings of fact to be submitted later by the court will itemize the numerous premises upon which this conclusion is based.

screens, it was only necessary every five or six years to the houses the nearest the roundhouse—at the houses along the highway. Normally, at places outside of the area at issue, we have determined that screens are good for ten years. Since the date of December 1, 1948, there is no more than normal damage to screens. The experts and the physical evidence have shown that clearly.

The two important recent improvements in the method of operation at the roundhouse are well explained by the words of a locomotive engineer:

"Q. These switch engines emit the same kind of smoke, and use the same kind of fuel, that is used in the engines that are being serviced in the roundhouse? A. That is correct.

"Q. And they do emit a reasonable amount of smoke in the switching operations? A. Yes, but they have an attachment that does away with a remarkable amount, seventy-five percent, of the black smoke.

"Q. When were they put on? A. Well, I think, as well as I remember, the first ones were put on three or four years ago. They have put on another one of a different type.

"Q. These appliances have diminished the smoke that comes out of the switch engines about seventy-five percent? A. We estimate it at that, yes, sir.

"The Court: All right, I understand these stationary bells that are over there where the engines are being serviced and steamed up before they are delivered to the engineer to go out on the run, but now you are talking about some device put on the switch engines which has been devised to reduce the amount of smoke coming from them while in operation?

"The Witness: Yes, sir.

"The Court: That is when they are away and out from under the bell?

"The Witness: Yes, sir, and also at the roundhouse it has been reduced.

"The Court: I understand that, but am I also to understand that where the engine is switching, away from the roundhouse,

there is also a device on the engine to reduce the smoke?

"The Witness: Yes, sir. They have an extra blower they put through holes in the front of the fire box on the side about one foot apart, by which they blow steam across the fire before it gets into the flues, and that takes out the carbon content of the smoke, as a result of which the smoke is not as black as it used to be when it is emitted from the stack."

To show that in the year 1948 and before, the additional smoke eliminating improvements and, importantly, the diligence of application and the decided cooperation of the laborers and the executives brought about a decisive reduction of the nuisance as it existed before, we quote the following excerpts from various witnesses:

"Q. Do you experience any trouble there from soot or smoke coming from the roundhouse? A. No, sir, not in the last eight years. About the first three years I operated that place I did have a little trouble.

"Q. The first three years would be about when? In 1937, '38 and '39, and probably some in 1940, too.

"Again:

"Q. Did you have any trouble there? A. Well, Mrs. Barrett owned it. I didn't have no trouble.

"Q. I mean with soot? A. Yes, the first two or three years I was there I had a little trouble with it."

Another witness said:

"Q. Have you noticed any smut or soot covering the lathes of the venetian blinds? A. Yes, I have seen that, I would say at times back five or six years ago."

It is safe to say that about one-third of the possible claimants of the area covered by the instant claimants have joined in this suit. We actually have about 20 residents who actually appear in this suit to tell that there is no actual discomfort or annoyance.

So, as a circumstance in this case, though it is not under the law decisive and fully controlling, we must say that the facilities employed by the defendant at

Bossier City are far in advance of facilities used by the industry generally in preventing or suppressing smoke, and that the defendant has done all that can be done to prevent smoke or its emission into the air. And, moreover, no one has yet been able to suggest any additional method or device.[4]

What the plaintiffs do not claim tends to show that the nuisance is not great. It is not claimed by anyone that the alleged nuisance has damaged the health of a single man, woman, or child. The houses are practically all of wood in the area; no damage is claimed to the wood. Flowers bloom freely and in abundance; if you visit the area during the blooming season, it is a veritable rose garden. No one has shown that the vegetables are damaged; nor is it claimed that the trees and shrubs suffer at all. The element of time is always a factor in the matter of suffering; it is indisputably shown in the case that, unless the wind blows from the direction of the roundhouse, nothing occurs over which the least complaint may be made. Finally, whatever discomfort or inconvenience that might exist is greatly reduced by distance from the roundhouse and by the presence of intervening trees, shrubs, and buildings, etc.[5]

As to the amount sought for damages by the plaintiffs, they have adopted (quite permissibly) the theory of an approximation of their damages in establishing the mental suffering due to discomfort or annoyance caused by the nuisance. The complaint has an amount opposite each name. No witness was asked to state a particular amount for mental anguish.

On the phase of property damage to cover the loss for injury to screens, exterior paint and interior paint, the plaintiffs submitted actual figures through one or two witnesses only. Then they had experts to testify in a general way as to such costs. On this phase of damages, injury to property, as in the case of the mental anguish, merely an amount opposite the name of each plaintiff is given.

4. In the report to the court in the McGee and Devoke cases, supra, by expert Langford, made relative to the very situs at issue here and on the operations of the same company, we quote the following two paragraphs:

"Some of the methods which had been installed were the building of hoods with water sprays over each smokestack of parked locomotives on switching tracks. The oil torch method was used in firing up or building new fires. Steam blowing system for better draft and systematic educational program on proper firing of locomotives was giving good results. With all of these working together the conditions were as good as could be had with the then known existing equipment for the abatement of smoke, and it is my judgment that they would meet any reasonable smoke laws that are in effect in many of our cities. I know the condition would be acceptable in the City of Birmingham, with which I am connected. Of course, we would not stop at this but strive to make improvements for still better conditions.

"One of the devices known as over-fire air smoke eliminator which at that time was in the experimental stages, and was not in use prior to the present time. They have been installed in all switching locomotives of the Y & M V Railroad Company in the Shreveport area and has since proved to be the most effective means of smoke elimination from coal-burning locomotives that have been devised at this time and will prove of great value to the people of Bossier City, and I am sure that it will be adopted by railroads in other cities where a smoke program is now in effect."

On the strength of the above report the state court did not issue an injunction against the defendant company, though such a writ had been asked by the plaintiffs

5. One of the credible and reputable witnesses for the defendant testified as follows:

"Q. Now, after you had sold the house to Mr. and Mrs. Alford, did they make any complaint to you about the condition? A. No, sir. I talked to—Mrs. Alford called me on the telephone after we moved to Shreveport, and to be exact I would say it was between three or six months after they bought the place, and she called me and told me about a shower she was giving for a railroad man's wife who lived across the street, and I asked her then how they liked the place and she said that they were very well satisfied, and well pleased with it, and nothing else was mentioned."

On the item of mental anguish, we conclude definitely that the matter is totally handled through approximation; we note the similarity in the amounts claimed by the various plaintiffs irrespective of the distance of their houses from the alleged source of trouble. This approximation is followed also on the item of physical injury to property. This is not correct.

██ We are satisfied beyond question that the mental anguish and the damage to property both depend directly upon the distance of the claimants' residences from the alleged source of nuisance. This generalization of the amounts claimed by the numerous plaintiffs is the result of the leadership by one or two of the active plaintiffs, who thus influenced the measurement of damages by all the others.

As another circumstance to prove that the grief of the several plaintiffs is considerably exaggerated is that the value of the property in the area involved has been constantly on the increase through the years. There has not been a single instance of a reduction in value. Furthermore, there has not been a vacant house in the area. The sales of the lots, with their pretty and attractive houses upon them, have been always brisk.

Now, as to the amount of damages to the various claimants, previous and on to the time of the above date, after which we declare there is no nuisance:

From the evidence contained in the case and from a half-dozen visits, well-distanced in time, made by the court to the allegedly affected area, we have concluded that the damages were greater to those nearer the source of the nuisance than they were to those living at some distance from the roundhouse.

There is no house closer than 420 feet from the alleged source of the nuisance. Between the alleged source of the nuisance and the area involved there is a main state highway, always full of traffic both ways. The first houses along this highway facing this source of nuisance have quite obviously suffered the most annoyance and inconvenience, for these have no shrubs, no trees, and no buildings between them and the alleged source of the nuisance—they have only the protection of the distance of 420 feet. Yet, in the instant case, without exception, all of the claimants are seeking to establish the same measure of damages as those of the very nearest to the source of the nuisance; even though they be 1600 feet further away.

At 2020 feet from the source, where the farthest plaintiffs reside, there was never susceptible injury, in our opinion, of any kind at any time. It follows that there can be no award for damages at that distance. At 420 feet from the source, where the closest plaintiff resides, the alleged nuisance, of necessity, was at its maximum. The injury suffered by each plaintiff is established in percentage by the relative position between these two distances the residence of that particular plaintiff occupies.

There is a depth of 1600 feet representing and containing the allegedly affected area. Each 16 feet further away from the source that the plaintiff resides means 1 per cent in the lessening of injury—consequently 1 per cent less in amount of damages.

Then that percentage, once established, will be taken of the total amount claimed. But we find that the claims of the plaintiffs are 25 per cent exaggerated, or overvalued, and, therefore, not due. Therefore, the original claims will all be first reduced by 25 per cent before the deduction for distance, as aforeexplained, be made.

There are three plaintiffs located on Monroe Street, which is in an entirely different direction than the other plaintiffs from the roundhouse. There is the intervening protection of a park. The distance of the residences from the alleged source of the nuisance is likewise a lessening factor. The claims of these three plaintiffs have been computed under the same formula as the others.

A list of the claimants with the amounts allowed each opposite their names, according to the above simple formula, is attached and made a part of this opinion.

This written opinion is not all-encompassing; we have read the note of evi-

dence; we have studied the pleadings; we have read attentively and fully the briefs of counsel; before signing a judgment, we request counsel for the plaintiffs and the defendant company to submit to us, in 20 days or less, their suggested findings of fact and conclusions of law, covering the case as decided. We shall adopt them in whole or in part, add or subtract, etc. After these are signed and filed by us, we shall then sign a judgment in keeping with this opinion and with the findings of fact and the conclusions of law.